Argued and submitted November 6, 1997, reversed on appeal; cross-appeal dismissed as moot September 30, 1998

Judy M. BRAY,
Personal Representative for the
Estate of Roy William Bray,
*Respondent - Cross-Appellant,*

*v.*

AMERICAN PROPERTY MANAGEMENT CORP.,
an Oregon corporation,
*Appellant - Cross-Respondent,*

*and*

Joseph E. WESTON,
Marilyn Weston and
American Property Management Corp.,
a general partnership doing business as
Weston Investment Co.,
*Defendants.*

(9504-02768; CA A93122)

965 P2d 426

Thomas M. Christ argued the cause for appellant - cross-respondent. With him on the briefs was Mitchell, Lang & Smith.

Dennis H. Elliott argued the cause for respondent - cross-appellant. With him on the brief was Elliott & Park.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

HASELTON, J.

Linder, J., concurring.

De Muniz, P. J., dissenting.

## HASELTON, J.

■ Defendant American Property Management Corporation[1] appeals a judgment entered after a jury rendered a verdict for plaintiff Judy Bray on her claim for wrongful death under the theory of *respondeat superior*. Plaintiff's husband Roy Bray died as a result of being stabbed during an altercation with defendant's employee. Defendant argues (1) that the trial court erred in denying its motion for a directed verdict because its employee was not acting "within the scope of his employment" when he stabbed plaintiff's husband; (2) that the trial court gave misleading jury instructions; and (3) that the trial court erred in excluding certain evidence. Plaintiff "cross-appeals," assigning error to the trial court's exclusion of evidence.[2] We reverse on appeal and dismiss the "cross-appeal."

As viewed in the light most favorable to plaintiff, *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984), the record discloses the following facts: In 1993, plaintiff and decedent bought a cafe/bakery which was located in The Jeffrey Center in downtown Portland. The Jeffrey Center also housed a parking garage, and the back door of the bakery opened onto the driveway of that parking garage. Defendant was the property manager for The Jeffrey Center, including the garage. Defendant's employee Oscar Davis was the parking attendant for the garage.

The Brays used the back door of the bakery and the garage driveway to load the van for early morning van deliveries of baked goods. The Brays' lease required that their van be out of the driveway of the parking garage before 8:00 every morning. Sometimes, however, Roy Bray would be late in making deliveries and would leave the van parked in the driveway until after 8:00, or would return to the driveway and park there after 8:00. After 8:00, the garage got busy

---

[1] Other parties were named as defendants in the complaint but were subsequently dismissed. They are not parties to this appeal.

[2] Although plaintiff styles its argument as a "cross-appeal," it is actually a cross-assignment of error because plaintiff does not seek to alter the judgment. *See Artman v. Ray*, 263 Or 529, 533, 501 P2d 63, *reh'g den* 263 Or 529, 502 P2d 1376 (1972); *Badger v. Paulson Investment Co., Inc.*, 100 Or App 12, 14, 784 P2d 125 (1989), *aff'd in part, rev'd in part* 311 Or 14, 803 P2d 1178 (1991).

and, if parked in the driveway, the delivery van obstructed and interfered with customers' use of the garage during that peak time in the morning. Oscar Davis and the Brays had several heated exchanges over the presence of the van in the driveway after 8:00 a.m.

Defendant apparently permitted the Brays to use the driveway to load the delivery van but did not grant them parking privileges. The Brays, however, regularly parked their car there at night when the daytime customers were gone. Davis's supervisor, Debra McCracken, was not aware of the Brays' use of the garage for nighttime parking until Davis informed her on December 14.

The Jeffrey Center employed a security service to monitor traffic in the building, lock the building at night, and "secure the parking garage." The security guards were on duty from 6:00 a.m. to 6:00 p.m. on the weekdays and from 8:00 a.m. to 4:00 p.m. on Saturday. They would report any incidents occurring on their shifts to McCracken. McCracken testified at trial that neither Davis, nor anyone else, was ever authorized by defendant to use force. There is no evidence in the record, however, that defendant explicitly told its employees that the use of force was not authorized. That is, although there is no evidence that defendant's management explicitly authorized Davis to use force, there is no evidence that McCracken, or any of defendant's managers, ever expressly forbade Davis from using force.

On the evening of December 13, 1994, Bray drove his car into the garage before Davis left work for the day. Bray asked Davis to park his car. Davis refused. In response, Bray called Davis a "son of a bitch" and threatened to "get even." Bray threw his keys at Davis and walked into the bakery. The next morning, Davis related the prior evening's exchange with Bray to McCracken. McCracken told Davis not to permit Bray to park his vehicle in the garage and that she would send the Brays a letter reminding them that they had no parking privileges.

After 6:00 that same evening, December 14, Bray again drove into the parking garage before Davis left work for the day. Davis told Bray that he could not park in the garage. Bray cursed and grabbed Davis around the neck and began to

choke him. Bray and Davis fell to the floor, scuffling. Davis reached into his pocket in the midst of that skirmish, pulled out his knife, and opened it using both hands. Davis then stabbed Bray in the chest. Bray rose, stumbled into the bakery, and died.

As personal representative of her husband's estate, plaintiff brought this wrongful death action. She alleged in her complaint that

"[a]t the time Oscar Davis assaulted and killed Roy Bray, he was acting within the course and scope of his employment with defendant APM and under defendant APM's express instruction not to let Roy Bray park his vehicle in the garage."

Defendant denied that Davis was acting within the scope of his employment when he stabbed Bray, and further, asserted the affirmative defense of self-defense.

After the presentation of the evidence, defendant moved for a directed verdict on the ground that plaintiff's evidence was insufficient, as a matter of law, to support a verdict holding defendant vicariously liable for Davis's tortious act. Defendant argued that, under the three-part test for vicarious liability announced in *Chesterman v. Barmon*, 305 Or 439, 442, 753 P2d 404 (1988), plaintiff's evidence fell short with respect to *Chesterman*'s second and third elements. More specifically, defendant argued, first, that

"the evidence stands unrebutted that Roy Bray was the aggressor, and that Mr. Davis's acts in responding to that aggression, whether excessive or not, clearly were not motivated to serve the employer at that time, and the employer, therefore, cannot be held vicariously liable."

Second, defendant argued that Davis was not hired to eject trespassers from the garage, but rather, was hired to park cars. Therefore, plaintiff provided no proof that Davis's act of "forcefully removing trespassers from the garage" was the kind of act he was hired to perform.

Defendant's motion for a directed verdict was premised on its argument that only one of two conclusions could follow from the evidence: (1) that Davis acted in self-defense, or (2) that Davis used excessive force and, therefore, was not

entitled to the defense of self-defense. This is because, defendant asserted, there is no evidence in the record showing Davis to be the aggressor. Defendant argued that either factual conclusion would defeat the imposition of liability based upon *respondeat superior*.

The trial court denied defendant's motion for a directed verdict. The case was submitted to the jury, which answered special interrogatories as follows:

"1.   Did Oscar Davis act in self-defense?

"ANSWER:   No.

"If your answer to question 1 is 'Yes,' your verdict is for defendant. Do not answer any more questions.

"* * * * *

"2.   Was Oscar Davis acting within the scope of his employment with defendant?

"ANSWER:   Yes.

"* * * * *

"3.   What are plaintiff's damages?

"ANSWER:   Economic Damages $281,000

"Noneconomic Damages $130,000."

The parties agree that, given the court's instructions,[3] the jury, in rejecting self-defense, necessarily determined that Davis used excessive force.

Defendant appeals, raising three assignments of error. In its first assignment of error, defendant argues that

---

[3] The court instructed the jury on self-defense as follows:

"I instruct you that a person is justified in using force upon another person in order to defend himself from what he reasonably believes to be the use of unlawful physical force. When defending, a person may only use that degree of force which he reasonably believes to be necessary.

"* * * * *

"A person is not justified in using deadly physical force on another person unless he reasonably believes the other person was, one, committing or attempting to commit a felony involving the use of or threatened imminent use of physical force against him or was using or about to use deadly physical force against him."

the trial court erred in denying its motion for a directed verdict because the evidence was insufficient as a matter of law to hold defendant vicariously liable for Davis's tortious act. Because we conclude that the first assignment compels reversal, we do not consider the other two.[4]

■     Employers are liable for the tortious acts of their employees when those acts are committed within the scope of their employment. An employee acts within the scope of employment when: (1) the tortious act occurs within the time and space limits of the employment; (2) the employee was motivated, at least in part, to serve the interests of the employer; and (3) the "act [was] of a kind which the employee was hired to perform." *Chesterman*, 305 Or at 442. Defendant concedes that plaintiff has met the first prong of the test. The issues reduce to whether plaintiff offered evidence from which the jury could conclude that Davis's conduct satisfied the second and third parts of the *Chesterman* test.

As to Davis's motivation, defendant contends that Davis was motivated solely by self-defense when he stabbed Bray. Although the jury found that Davis was not entitled to a defense of self-defense, defendant asserts that that finding merely evinces the jury's determination that Davis used excessive force in repelling Bray's attack. The use of excessive force, defendant asserts, could only have been motivated by Davis's personal purposes, including Davis's antipathy towards Bray, and not by any desire to serve defendant.

Plaintiff responds by pointing out that only one day before Bray was stabbed, Davis's supervisor told him not to let Bray park in the garage. That fact, plaintiff asserts, supports a finding that Davis was motivated, at least in part, to serve his employer when he initially confronted Bray. The scuffle and eventual stabbing, even if motivated largely by self-defense, was an inseparable part of that initial confrontation, and was, therefore, also motivated in part to serve defendant's interest.

---

[4] In its second assignment of error, defendant argues that the court erred in giving particular jury instructions relating to *respondeat superior*. In its third assignment, defendant asserts that the court erred in granting plaintiff's motion to exclude evidence of Bray's alleged use of racial epithets to Davis.

■ On that point, we agree with plaintiff. In determining whether an employee was at least partly motivated to serve his or her employer, the appropriate inquiry is a subjective one: Did the employee believe that he or she was serving the employer by performing the acts in question? Plaintiff offered evidence from which the jury could determine that Davis believed that his act of confronting Bray and his immediately ensuing conduct resulting from that confrontation were at least partially motivated to serve his employer. Further, a jury could reasonably conclude that the confrontation and melee were so temporally intertwined and inseparable that the stabbing was part and parcel of the initial confrontation and that, no matter how misguided Davis's actions were, his motivation with respect to the former could not be meaningfully distinguished or separated from the latter. We turn to the third part of the *Chesterman* test: Was Davis's act "of a kind [he] was hired to perform[?]" 305 Or at 442. Defendant contends that Davis was hired to park cars, not to eject trespassers. Further, defendant argues that Davis had no express or implied authority to use force in carrying out the duties of his job. Consequently, defendant reasons, stabbing a trespasser is not the kind of act Davis was hired to perform. Plaintiff responds that defendant entrusted Davis with discretion and decision-making power in deciding how to perform his job duties, one of which was to prevent Bray from parking in the garage. Further, plaintiff contends that, because McCracken specifically directed Davis not to allow Bray to park in the garage, *confronting* Bray was within Davis's job duties—and, thus, Bray's death was an actionable result of that authorized confrontation.

Neither we nor the Supreme Court has amplified, much less refined, the third *Chesterman* requirement. Rather, we have merely applied that factor, without much explanation, on a case-by-case basis. *See, e.g.,Walthers v. Gossett*, 148 Or App 548, 558, 941 P2d 575 (1997); *Whelan v. Albertson's, Inc.*, 129 Or App 501, 508, 879 P2d 888 (1994); *Mains v. II Morrow, Inc.*, 128 Or App 625, 631-33, 877 P2d 88 (1994); *Carlson v. Crater Lake Lumber Co.*, 105 Or App 314, 317, 804 P2d 511 (1991).

In so describing our prior cases, we imply no criticism. The inquiry begs for question-begging. It is the jurisprudential equivalent of bobbing for apples: In determining

whether "the act is of a kind which an employee was hired to perform," the dispositive issue is how broadly or narrowly to define "the act." Moreover, it is a rare case indeed in which an employee's job description explicitly encompasses intentional torts. Thus, our collected case law might be perceived, albeit unfairly, as "results in search of a rationale."

■    We say "unfairly" because a closer reading of our decisions, and those of the Supreme Court, yields a common principle: Given the conduct authorized by the employer and the general nature of the employee's duties, was it reasonably foreseeable that, in performing his or her work, the employee would commit the tort that underlies the *respondeat superior* claim? *See, e.g., Walthers,* 148 Or App at 548 (acts of sexual abuse are not a reasonably foreseeable consequence of activities authorized in the course of orthodontia treatment); *Brungardt v. Barton,* 69 Or App 440, 444, 685 P2d 1021 (1984) (police officer's use of excessive force in arresting plaintiff may be a reasonably foreseeable consequence of the authorized use of force); *Haase v. City of Eugene,* 85 Or App 107, 111, 735 P2d 1258 (1987) (same). *See generally G.L. v. Kaiser Foundation Hospitals, Inc.,* 306 Or 54, 60, 757 P2d 1347 (1988).

■    Two hypotheticals, varying the facts presented here, illustrate that principle:

•    On the evening of December 14, just as Bray attempts to park his car, Davis, without saying a word, pulls out a gun and shoots and kills Bray. Under *Chesterman,* the inquiry would be whether Davis's action in shooting Bray without provocation was a reasonably foreseeable result of McCracken's directive not to allow Bray to park in the garage at night. Because no reasonable person would agree that Davis's action in that instance would be a foreseeable consequence of McCracken's directive, Davis's action of shooting Bray without provocation would, as a matter of law, have fallen outside the scope of employment.

•    Conversely, on December 14, rather than confronting Bray when he parks his car, Davis later drives the car out of the garage without Bray's permission and parks it on a nearby street. Assuming trespass to chattels could be proven, the *respondeat superior* issue would be whether

removing Bray's car without his permission would have been a reasonably foreseeable consequence of McCracken's directive. A jury could reasonably impose liability in those circumstances.

The circumstances actually presented here fall within neither of those extreme—and, hence, clear—scenarios. Even if it is assumed that *Chesterman's* third prong encompasses an employee's use of reasonable force in defending himself or herself from assaults foreseeably associated with job performance, the question posed here is whether Davis's use of *excessive* force was within the realm of reasonably foreseeable actions resulting from McCracken's directive.

We conclude that Davis's conduct here is more analogous to the "murder" hypothetical than to the "trespass" hypothetical. Although McCracken had told Davis not to allow Bray to park in the garage after the two had been involved in a heated verbal exchange the day before, a reasonable juror could not conclude that Davis's killing of Bray was a reasonably foreseeable consequence of McCracken's directive. Consequently, as a matter of law,[5] Davis's conduct did not satisfy *Chesterman's* third requirement.[6]

The dissent disagrees on that dispositive point, concluding that "it is the act's *connection* to the employee's job responsibility or lack thereof that sets the parameters of foreseeability." 156 Or App at 370 (original emphasis). Imposing

---

[5] Although the question of whether an employee's acts fell within the scope of employment would ordinarily be a jury question, it becomes a question of law for the court where only one reasonable conclusion can be drawn from the facts. *See Stanfield v. Laccoarce,* 284 Or 651, 655, 588 P2d 1271 (1978). *Cf. Carawan v. Tate,* 53 NC App 161, 280 SE2d 528, 531 (1981), *modified and aff'd* 304 NC 696, 286 SE2d 99 (1982) (whether employee of parking lot service was acting within the scope of his employment was a question for the jury where the evidence showed that the employee pointed a pistol at a customer's face threatening him if he did not give the employee three dollars for parking in the lot).

[6] In so holding, we emphasize that Davis was not explicitly authorized to use force as part of his employment. We imply no view as to the imposition of *respondeat superior* liability when an employee who has been so authorized engages in the use of excessive force. *Accord Brungardt v. Barton,* 69 Or App 440, 444, 685 P2d 1021 (1984) (police officer's use of excessive force may be within the scope of employment).

liability based on mere literal job connectedness, without reference to the reasonableness of that "connection" cannot be squared with controlling authority. *See G.L. v. Kaiser Foundation Hospitals, Inc.*, 306 Or at 60 (vicarious liability for intentional torts arises where the act is "done in connection with servant's employment * * * *if* the act was not unexpectable in view of the duties of the servant") (emphasis added) (quoting with approval *Restatement (Second) of Agency* § 245 (1958)).[7] Here, Davis's murder of Bray was "unexpectable" "in view of the duties of the servant." Moreover, as amplified in the concurring opinion, such unqualified reliance on job connectedness would lead to anomalous results. *See* 156 Or App at 367 (Linder, J., concurring). The trial court erred in denying defendant's motion for a directed verdict.

■        We turn to plaintiff's "cross-appeal." Plaintiff asserts:

> "In the event this Court rules that the trial court erred in granting plaintiff's motion to exclude evidence of Bray's use of racial invectives [plaintiff's third assignment of error], and this matter is sent back for a new trial, Bray as cross-appellant assigns error to the trial court for granting defendant's motion to exclude evidence of Davis's use of alcohol on the day of the killing and defendant's notice of Davis's prior use of alcohol on the job."

As plaintiff's description of her "cross-appeal" reveals, plaintiff does not seek to alter the judgment of the trial court. Rather, plaintiff asserts that the judgment should be upheld, but, *if defendant prevailed on its third assignment of error* (*i.e.*, that if defendant was not entitled to a directed verdict, it was nevertheless entitled to a new trial because the trial court erred in excluding evidence of Bray's alleged use of racial slurs),[8] then this court should instruct the trial court on remand to admit certain evidence.

---

[7] The dissent also relies on *Mains v. II Morrow, Inc.*, 128 Or App 625, 632, 877 P2d 88 (1994), and, particularly, our quotation of a Ninth Circuit discussion of job connectedness. 156 Or App at 369-70. Immediately before that quotation, we quoted with approval G.L.'s (and the *Restatement's*) "not unexpectable" formulation. Thus, the two must be read in combination.

[8] As noted, we do not reach that assignment of error. 156 Or App at 361-62.

Given that posture, we do not consider the "cross-appeal." As noted, plaintiff asks us to review that matter *only* if we reverse and remand on the basis of defendant's third assignment of error. We have not done so.[9]

Reversed on appeal; cross-appeal dismissed as moot.

**LINDER, J.,** concurring.

I write separately, if briefly, to underscore the area of my agreement with the majority and the area of my disagreement with the dissent. The majority concludes that the third prong of the test outlined in *Chesterman v. Barmon*, 305 Or 439, 442, 753 P2d 404 (1988)—an act "of a kind which the employee was hired to perform"—requires an assessment of whether, given the conduct authorized by the employer, it was reasonably foreseeable that the employee would commit the tort in question. 156 Or App at 363-64. The dissent, in contrast, believes the majority's test is too narrowly drawn and that *connection* to the employee's job responsibilities sets the boundaries of foreseeability. 156 Or App at 370.

The dissent's standard reduces to something perilously close to strict liability, in my view. Here, for example, the dissent concludes that because defendant directed Davis not to permit Bray to park in the garage and because Bray (not Davis, it is worth noting) had threatened to "get even" in connection with a prior parking dispute, stabbing Bray to death was sufficiently connected to Davis's employment responsibilities to create liability for his employer. *See id.* Presumably, then, *respondeat superior* liability also would attach in the following two situations:

• A lawyer in Portland gives a law clerk a document that must be physically delivered no later than 5 p.m. that day to the court clerk in another county. There is enough time to deliver it, but no time to spare. The lawyer directs the clerk:

---

[9] We note that evidence of Davis's consumption of alcohol would not affect our conclusion that defendant could not be vicariously liable for its employee's tortious act. Although the complaint does include an allegation that Davis had been drinking on the day of the altercation with Bray, it does not include an allegation that defendant knew that Davis had been drinking or that defendant knew that Davis had a problem with alcohol. The complaint does not allege either negligent retention or negligent hiring. Plaintiff's only claim was an intentional tort claim under a *respondeat superior* theory.

"Don't let anything get in your way. Make sure it's there on time." The clerk deliberately runs a slow moving car off the road, killing the driver.

• A belligerent customer several times has engaged in sexually harassing behavior towards a waitress at a cafe. The waitress finally complains to the cafe owner, who tells her: "You don't have to take that kind of abuse. Refuse to serve him and make him leave." The customer repeats the harassment and then refuses to leave when the waitress tells him to. The waitress pulls out a gun from behind the counter and kills him.

Those are, to be sure, extreme and even seemingly fanciful examples. But as the facts of this case demonstrate, as unlikely as those hypotheticals might be, they could happen. If they were to happen, the tortious conduct would be *connected* to work activity and that would be enough to create liability for the employer, as I understand the dissent's test. But in neither instance would I hold that the conduct meets the third prong of *Chesterman*. The majority's refinement of that prong of *Chesterman* better serves the agency principles at work. *See G.L. v. Kaiser Foundation Hospitals, Inc.*, 306 Or 54, 60, 757 P2d 1347 (1988) (adopting *Restatement (Second) of Agency* § 245 (1957)[1]).

**DE MUNIZ, P. J.,** dissenting.

In *Chesterman v. Barmon*, 305 Or 439, 442, 753 P2d 404 (1988), the Supreme Court devised a three-part test to determine whether an employee is within the scope of employment. Under the *Chesterman* test, an employee acts within the scope of employment when: (1) the tortious act occurs within the time and space limits of the employment; (2) the employee was motivated, at least in part, to serve the interests of the employer; and (3) the "act [was] of a kind which the employee was hired to perform." *Id.* at 442.

The majority agrees that the first two *Chesterman* factors are met here but concludes that plaintiff's proof failed

---

[1] Section 245 of the *Restatement* provides:

"A master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, if the act *was not unexpected* in view of the duties of the servant." (Emphasis added.)

as to the third. I dissent from the majority's determination as to the third prong because, in my view, its analysis of the third prong is overly narrow and, in effect, usurps the province of the jury.

Plaintiff's evidence establishes that defendant knew that Bray previously had called Davis a "son of a bitch" and threatened to "get even" in connection with a parking dispute. With full knowledge of that background, defendant nevertheless instructed Davis not to permit Bray to park in the garage. It was as Davis carried out defendant's specific order not to permit Bray to park in the garage that Bray attacked him.

It is against this background that the majority asserts that the dispositive question is "whether Davis's use of *excessive force* was within the realm of reasonably foreseeable actions resulting from McCracken's directive." In my view, the majority's question is too narrowly drawn and does just what the majority criticizes our prior opinions of doing—it begs the question. Of course, defendant did not intend or reasonably foresee that Davis would *kill* Bray. However, as the majority points out, "it is a rare case indeed in which an employee's job description explicitly encompasses intentional torts."

In *G.L. v. Kaiser Foundation Hospitals, Inc.*, 306 Or 54, 60, 757 P2d 1347 (1988), the Supreme Court acknowledged that employers may be liable for the intentional torts of an employee and quoted with approval *Restatement (Second) of Agency* 537, section 245 (1957), which provides:

> " 'A master is subject to liability for the intended tortious harm by a servant to the person or things of another *by an act done in connection with the servant's employment, although the act was unauthorized, if the act was not unexpected in view of the duties of the servant.*' " (Emphasis added.)

In a similar vein, in *Mains v. II Morrow, Inc.*, 128 Or App 625, 632, 877 P2d 88 (1994), we quoted the following from a Ninth Circuit case analyzing Oregon law:

> " '[T]he specific egregious act giving rise to an intentional tort claim will itself rarely be "of a kind which the employee

was hired to perform"; the appropriate inquiry is whether the employee committed the tort while performing, or in connection with, his job responsibilities.' *Dias v. Sky Chefs, Inc.*, 919 F2d 1370, 1375 (9th Cir 1990), *vacated on other grounds* 501 US 1201, 111 S Ct 2791, 115 L Ed 2d 965 (1991), *affirmed on remand* 948 F2d 532 (9th Cir 1991), *cert denied* [503] US [920], 112 S Ct 1294, 117 L Ed 2d 517 (1992)."

Both *G.L.* and *Mains* make it abundantly clear that it is the unauthorized act's *connection* or lack thereof to the employee's job duties or responsibilities that determines whether "the act [was] of a kind which the employee was hired to perform." This is true even when the test is phrased, as the majority does, in terms of "foreseeable consequence" because it is the act's *connection* to the employee's job responsibility or lack thereof that sets the boundaries of foreseeability.

Here, the confrontation between Davis and Bray arose out of Davis's enforcement of defendant's directive not to permit Bray to park in the garage. In the context of the evidence here, a confrontation with Bray over parking was within the realm of reasonably foreseeable actions that could result from defendant's directive to Davis and, thus, had a connection to Davis's employment responsibilities. The fact that Davis's response to Bray's attack was excessive does not destroy the act's *connection* to Davis's job duties. I would hold that a jury could, as it did here, find that Davis's acts occurred within the scope of his employment.

I respectfully dissent.