Submitted on remand September 29, affirmed on appeal; cross-appeal dismissed as moot November 10, 1999, petition for review denied May 9, 2000 (330 Or 331)

Judy M. BRAY,
Personal Representative for
the Estate of Roy William Bray,
*Respondent - Cross-Appellant,*

*v.*

AMERICAN PROPERTY MANAGEMENT CORP.,
an Oregon corporation,
*Appellant - Cross-Respondent,*

*and*

Joseph E. WESTON,
Marilyn Weston and
American Property Management Corp.,
a general partnership doing business as
Weston Investment Co.,
*Defendants.*

(9504-02768; CA A93122)

988 P2d 933

Thomas M. Christ and Mitchell, Lang & Smith for appellant - cross-respondent.

Dennis H. Elliott and Elliott & Park for respondent - cross-appellant.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

HASELTON, J.

**HASELTON, J.**

This wrongful death case is before us on remand, *Bray v. American Property Management Corp.*, 329 Or 317, 984 P2d 854 (1999), following the Supreme Court's decisions in *Fearing v. Bucher*, 328 Or 367, 977 P2d 1163 (1999), and *Lourim v. Swensen*, 328 Or 380, 977 P2d 1157 (1999). In our original opinion, we concluded that the trial court erred in denying defendant's motion for a directed verdict and, specifically, that defendant was not vicariously liable for its employee's conduct in stabbing and killing plaintiff's decedent. *Bray v. American Property Management Corp.*, 156 Or App 356, 965 P2d 426 (1998), *rem'd* 329 Or 317, 984 P2d 854 (1999). On reconsideration, we conclude that our holding was incorrect in light of *Fearing* and *Lourim*. We further reject defendant's other, previously unaddressed, assignments of error. Accordingly, we affirm.

The material facts, viewed most favorably to plaintiff as the party prevailing at trial, were recounted in our previous opinion:

"In 1993, plaintiff [Judy Bray] and decedent [her husband, Roy Bray] bought a café/bakery which was located in The Jeffrey Center in downtown Portland. The Jeffrey Center also housed a parking garage, and the back door of the bakery opened onto the driveway of that parking garage. Defendant was the property manager for The Jeffrey Center, including the garage. Defendant's employee Oscar Davis was the parking attendant for the garage.

"The Brays used the back door of the bakery and the garage driveway to load the van for early morning van deliveries of baked goods. The Brays' lease required that their van be out of the driveway of the parking garage before 8:00 every morning. Sometimes, however, Roy Bray would be late in making deliveries and would leave the van parked in the driveway until after 8:00, or would return to the driveway and park there after 8:00. After 8:00, the garage got busy and, if parked in the driveway, the delivery van obstructed and interfered with customers' use of the garage during that peak time in the morning. Oscar Davis and the Brays had several heated exchanges over the presence of the van in the driveway after 8:00 a.m.

"Defendant apparently permitted the Brays to use the driveway to load the delivery van but did not grant them parking privileges. The Brays, however, regularly parked their car there at night when the daytime customers were gone. Davis's supervisor, Debra McCracken, was not aware of the Brays' use of the garage for nighttime parking until Davis informed her on December 14.

"The Jeffrey Center employed a security service to monitor traffic in the building, lock the building at night, and 'secure the parking garage.' The security guards were on duty from 6:00 a.m. to 6:00 p.m. on the weekdays and from 8:00 a.m. to 4:00 p.m. on Saturday. They would report any incidents occurring on their shifts to McCracken. McCracken testified at trial that neither Davis, nor anyone else, was ever authorized by defendant to use force. There is no evidence in the record, however, that defendant explicitly told its employees that the use of force was not authorized. That is, although there is no evidence that defendant's management explicitly authorized Davis to use force, there is no evidence that McCracken, or any of defendant's managers, ever expressly forbade Davis from using force.

"On the evening of December 13, 1994, Bray drove his car into the garage before Davis left work for the day. Bray asked Davis to park his car. Davis refused. In response, Bray called Davis a 'son of a bitch' and threatened to 'get even.' Bray threw his keys at Davis and walked into the bakery. The next morning, Davis related the prior evening's exchange with Bray to McCracken. McCracken told Davis not to permit Bray to park his vehicle in the garage and that she would send the Brays a letter reminding them that they had no parking privileges.

"After 6:00 that same evening, December 14, Bray again drove into the parking garage before Davis left work for the day. Davis told Bray that he could not park in the garage. Bray cursed and grabbed Davis around the neck and began to choke him. Bray and Davis fell to the floor, scuffling. Davis reached into his pocket in the midst of that skirmish, pulled out his knife, and opened it using both hands. Davis then stabbed Bray in the chest. Bray rose, stumbled into the bakery, and died." *Bray*, 156 Or App at 358-60.

As personal representative of her husband's estate, plaintiff brought this wrongful death action, alleging that defendant, as Davis's employer, was vicariously liable for

Davis's conduct. At trial, defendant moved for a directed verdict, arguing that plaintiff's proof was legally insufficient to satisfy the second and third elements of the three-part test for vicarious liability set out in *Chesterman v. Barmon*, 305 Or 439, 442, 753 P2d 404 (1988). The court denied that motion, and the jury returned a verdict for plaintiff.

On appeal, we reversed, concluding that, although the evidence permitted a finding that Davis was motivated, at least in part, to serve defendant, no reasonable juror could conclude that *Chesterman*'s third element was satisfied— that is, that the "act [was] of a kind which the employee was hired to perform." *Chesterman*, 305 Or at 442. We concluded:

> "Although McCracken had told Davis not to allow Bray to park in the garage after the two had been involved in a heated verbal exchange the day before, a reasonable juror could not conclude that Davis's killing of Bray was a reasonably foreseeable consequence of McCracken's directive." *Bray*, 156 Or App at 365.[1]

*But see* 156 Or App at 368, 370 (De Muniz, P. J., dissenting) ("The fact that Davis's response to Bray's attack was excessive does not destroy the act's *connection* to Davis's job duties.") (emphasis in original).

Plaintiff sought review, and, while review was pending, the Supreme Court issued its opinions in *Fearing* and *Lourim*. The Supreme Court subsequently vacated our decision and remanded to us for further consideration in light of those decisions. We now conclude that *Fearing* and *Lourim* dictate a different analysis than we initially applied and, hence, compel a different result.

*Fearing* and *Lourim* addressed the legal sufficiency of allegations that the defendant employers were vicariously liable for sexual abuse committed by their employees. In both cases, the Supreme Court held that the facts alleged were sufficient to permit the imposition of such liability. In so holding, the court emphasized that, even if the tortious act was not itself within the scope of the employment, the employer could, nevertheless, be liable "if acts that were within [the

---

[1] Because of that conclusion, we did not address defendant's two remaining assignments of error, which we discuss below. *See* 164 Or App at 141-44.

employee's] scope of employment 'resulted in the acts which led to injury to plaintiff.' " *Fearing*, 328 Or at 374 (quoting *Chesterman*, 305 Or at 443); *see Lourim*, 328 Or at 386.[2]

In *Fearing*, the court concluded:

"[A] jury could infer that the sexual assaults were the culmination of a progressive series of actions that began with and continued to involve [the employee's] performance of the ordinary and authorized duties of a priest. Viewing the complaint in that light, the jury also could infer that, in cultivating a relationship with plaintiff and his family, [the employee], at least initially, was motivated by a desire to fulfill his priestly duties and that, over time, his motives became mixed. * * *

"* * * * *

"This is not a case like *G. L.* [*v. Kaiser Foundation Hospitals*, 306 Or 54, 757 P2d 1347 (1988)], in which the *only* nexus alleged between the employment and the assault was that the employment brought the tortfeasor and the victim together in time and place and, therefore, gave the tortfeasor the 'opportunity' to commit the assaults. Here, plaintiff alleges that [the employee] 'us[ed] and manipulat[ed] his fiduciary position, respect and authority as youth pastor and priest' to befriend plaintiff and his family, gain their trust, spend large periods of time alone with plaintiff, physically touch plaintiff and, ultimately, to gain the opportunity to commit the sexual assaults upon him. A jury reasonably could infer that [the employee's] performance of his pastoral duties with respect to plaintiff and his family were a necessary precursor to the sexual abuse and that the assaults thus were a direct outgrowth of and were engendered by conduct that was within the scope of [the employee's] employment." 328 Or at 375-77 (emphasis in original; citation omitted).

---

[2] In *Lourim*, the court cautioned:

"[I]n the intentional tort context, it usually is inappropriate for the court to base its decision regarding the adequacy of allegations supporting a claim for vicarious liability based on the doctrine of *respondeat superior* on whether the intentional tort *itself* was committed in furtherance of any interest of the employer or involved the kind of activity that the employee was hired to perform. * * * [T]he proper focus rather [is] whether the complaint contained sufficient allegations of employee conduct that arguably *resulted in* the acts that led to plaintiff's injury." 328 Or at 386 (emphasis in original).

Similarly, in *Lourim*, the court concluded:

"[A] jury reasonably could infer that the sexual assaults were merely the culmination of a progressive series of actions that involved the ordinary and authorized duties of a Boy Scout leader. * * * A jury also reasonably could infer that [the employee's] performance of his duties as troop leader with respect to plaintiff and his family was a necessary precursor to the sexual abuse and that the assaults were a direct outgrowth of and were engendered by conduct that was within the scope of [the employee's] employment. Finally, a jury could infer that [the employee's] contact with plaintiff was the direct result of the relationship sponsored and encouraged by the Boy Scouts, which invested [the employee] with authority to decide how to supervise minor boys under his care." 328 Or at 386-87.

*See also Minnis v. Oregon Mutual Ins. Co.*, 162 Or App 198, 207, 986 P2d 77 (1999) (reversing summary judgment and concluding, *inter alia*, that pleadings sufficiently alleged facts supporting vicarious liability where jury could reasonably infer that on-the-job harassment was within scope of tortfeasor's employment; that such conduct was a "necessary precursor" to later sexual abuse; and that later assaults were "a direct outgrowth of and were engendered by" on-the-job conduct).

■    In this case, plaintiff's proof was sufficient to permit the jury to impose vicarious liability under *Chesterman*, as amplified in *Fearing* and *Lourim*. Consistent with those precedents, the appropriate focus here is not on the stabbing itself but on whether "acts that were within [Davis's] scope of employment resulted in the acts that caused" the injury. *Fearing*, 328 Or at 374.

■    Here, as in *Fearing* and *Lourim*, the jury could find that the stabbing was "merely the culmination of a progressive series of actions that involved [Davis's] ordinary and authorized duties." *Lourim*, 328 Or at 386. That is, reasonable jurors could find that the stabbing was the product of the escalating antagonism between Davis and Bray centering on Bray's obstruction of access to the parking garage and use of that garage, specifically including the December 13, 1994, interchange. Moreover, reasonable jurors could find that McCracken's directive to Davis not to permit Bray to park in

the garage was a "necessary precursor to" the stabbing and that the stabbing was "a direct outgrowth and [was] engendered by conduct that was within the scope of [Davis's] employment," *viz.*, Davis's telling Bray that he could not park in the garage. As amplified in *Fearing* and *Lourim*, direct causation, not "reasonable foreseeability" (as in our prior opinion), is the *sine qua non* of *respondeat superior* liability. Accordingly, plaintiff's proof was sufficient to withstand defendant's directed verdict motion.[3]

■       Defendant next assigns error to the trial court's instruction on vicarious liability, which stated:

"* * * I instruct you that an employer[ ] [is] liable for an employee's conduct when the employee acts within the scope of the employment. Three requirements are necessary: One, whether the act occurred substantially within the time and space limits authorized by the employment; two, whether the employee was motivated at least partially by a purpose to serve the employer; and three, whether the act is of a kind which the employee was hired to perform or incidental to the conduct authorized.

"I instruct you that an employer is subject to liability for harm done by its employee to another person by an act done in connection with the employee's employment even though the act was unauthorized, if the act was not unexpected in view of the duties of the employee.

"The question is whether the employee committed the harm to another while performing his job or in connection with his job responsibilities."

---

[3] Defendant asserts that *Fearing* and *Lourim* are materially distinguishable because Davis, unlike the tortfeasors in those cases, "did not use or manipulate his job to gain the opportunity to commit the tort" and because "[t]he tort in this case, unlike the torts in those cases, was unpremeditated." Although defendant is, of course, correct that the facts are different here, we do not understand *Fearing* or *Lourim*, in their core analysis, to require proof of "manipulation" and "premeditation." *See, e.g., Minnis*, 162 Or App at 207 (concluding, without reference to "manipulation" or "premeditation," that vicarious liability allegations were sufficient under *Fearing/Lourim* formulation).

Defense counsel's exception to that instruction was general:

> "With respect to the instruction on respondeat superior, I would urge the court that the language [in the second paragraph] applies in the defendant's opinion really to [the third *Chesterman* element] only, and it should have been prefaced by three and to not do so made it sound like it was the sole test, and I think in doing that that is misleading and confusing to the jury.

> "Secondly, the court's last paragraph in that instruction kind of winds it up with the language the question is whether the employee committed the harm to another while performing his job or in connection with his job responsibilities. To me that kind of is again misstating and confusing and I would submit to the court respectfully it is not—the way it's fashioned, it is not a proper statement of the law."

██ In reviewing jury instructions, we will reverse only if we "can fairly say that the instruction probably created an erroneous impression of the law in the minds of the jurymen which affected the outcome of the case." *Waterway Terminals v. P. S. Lord*, 256 Or 361, 370, 474 P2d 309 (1970); *see also State v. Williams*, 313 Or 19, 38, 828 P2d 1006, *cert den* 506 US 858 (1992) ("For an instruction to constitute reversible error, it must have prejudiced the defendant when the instructions are considered as a whole."). Here, the instruction on vicarious liability was not a model of clarity. It represented a cut-and-paste melding of the *Chesterman* standard (the first paragraph of the instruction) and language quoted with approval in *G. L. v. Kaiser Foundation Hospitals, Inc.*, 306 Or 54, 60, 757 P2d 1347 (1988) (the second paragraph of the instruction)[4] and *Mains v. II Morrow, Inc.*, 128 Or App 625, 632, 877 P2d 88 (1994) (the third paragraph of the

---

[4] In *G. L.*, 306 Or at 60, the court quoted with approval the formulation of section 245 of the *Restatement (Second) of Agency* (1957):

"A master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, if the act was not unexpected in view of the duties of the servant."

*See also Mains v. II Morrow, Inc.*, 128 Or App 625, 632, 877 P2d 88 (1994) (also quoting section 245 with approval).

instruction).[5] In many ways, the instruction here exemplifies the *caveat* that "[a]n instruction that accurately quotes or faithfully paraphrases an appellate decision is not necessarily beyond reproach." *Rogers v. Meridian Park Hospital*, 307 Or 612, 616, 725 P2d 929 (1989). Nevertheless—and without endorsing the instruction in all its particulars, particularly given *Lourim*'s and *Fearing*'s refinement—we do not believe that the instructions, in context, "probably created an erroneous impression as to the applicable law * * * which affected the outcome of the case." *Waterway Terminals*, 256 Or at 361; *see also, e.g., Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or App 371, 385, 879 P2d 1288 (1994), *rev dismissed* 321 Or 511 (1995) ("[W]e cannot say that the instructions, taken as a whole, caused the jury to decide the case one way or the other."); *Paragano v. Gray*, 126 Or App 670, 677-78, 870 P2d 837 (1994) (applying principle).

■■    Finally, defendant assigns error to the trial court's exclusion of evidence that the decedent, Bray (who was white) used racial slurs in his face-to-face encounters, including the fatal assault, with Davis (who is African-American) and similarly referred to Davis in conversations with third persons. Defendant acknowledges that we review the trial court's exclusionary ruling for abuse of discretion, *see Carter v. Moberly*, 263 Or 193, 200-03, 501 P2d 1276 (1972), but contends that the proferred evidence was so highly probative of whether "Davis had a private motive for attacking Bray" that its exclusion was erroneous. We disagree. As *Fearing* and *Lourim* clarify, the proper focus of *Chesterman*'s second, "motivation" inquiry is not, as defendant posits, on the tortious act itself—here, the stabbing. *See, e.g., Lourim*, 328 Or at 386. Rather, the focus is on the predicate conduct, *viz.*, Davis's employer-authorized statement to Bray that he could not park in the garage. Thus, properly viewed, any probative

---

[5] In *Mains*, we quoted with approval the following language from *Dias v. Sky Chefs, Inc.*, 919 F2d 1370, 1375 (9th Cir 1990), *vac'd on other grounds* 501 US 1201 (1991), *aff'd on remand* 948 F2d 532 (9th Cir 1991), *cert den* 503 US 920 (1992):

" '[T]he specific egregious act giving rise to an intentional tort claim will itself rarely be "of a kind which the employee was hired to perform;" *the appropriate inquiry is whether the employee committed the tort while performing, or in connection with, his job responsibilities*.' " 128 Or App at 632 (emphasis added).

value of Bray's alleged use of racial epithets was insubstantial. Conversely, the potential for undue prejudice from the admission of such evidence was manifest. *See* OEC 403. We cannot say, given the totality of the circumstances,[6] that the trial court abused its discretion.[7]

Affirmed on appeal; cross-appeal dismissed as moot.

---

[6] We note, parenthetically, that the trial court also excluded plaintiff's evidence of Davis's alleged alcoholism and his alcohol consumption on the day of the stabbing. That exclusion is the subject of plaintiff's "cross-appeal," *see Bray*, 156 Or App at 358 (plaintiff's "cross-appeal" is, in fact, a cross-assignment of error), which, given our disposition, we do not reach. *Id.* at 366-67.

[7] As the court explained in *Carter*:

"We simply determine whether, on the facts of the particular case, the trial court's ruling was within the reasonable or permissible range. We need not determine whether [its] ruling was the only one possible. It may be that the record will support either admission or exclusion; if so, the trial court's ruling will be affirmed, regardless of which solution we would prefer." 263 Or at 201.