Argued and submitted November 30, 1998, reversed and remanded in part;
otherwise affirmed August 4, 1999

## John MINNIS
### and Little John's Pizza Co., LLC,
*Appellants,*

*v.*

## OREGON MUTUAL INSURANCE COMPANY,
*Respondent.*

## (C96-1230-CV; CA A98241)

986 P2d 77

Christopher A. Rycewicz argued the cause for appellants. With him on the briefs were Brian D. Chenoweth and Rycewicz & Chenoweth, P.C., and Michael J. Knapp and Myers & Knapp.

William G. Earle argued the cause for respondent. With him on the brief were Alan Gladstone and Abbott, Davis, Rothwell, Mullin & Earle, P.C.

Before Edmonds, Presiding Judge, and Armstrong and Kistler,* Judges.

KISTLER, J.

Edmonds, P. J., dissenting.

---

* Kistler, J., *vice* Warren, P. J., retired.

**KISTLER, J.**

Plaintiffs, a corporation and its owner, appeal from a summary judgment dismissing their claim for breach of an insurance policy. They argue that defendant had a duty to provide a defense to an action that a third party (Winters) filed against them. Plaintiffs also seek indemnity for the cost of settling the case. We conclude that defendant had a duty to defend the corporation and that it was not entitled to summary judgment on the related question of whether it had a duty to indemnify the corporation. We conclude, however, that defendant had no duty to defend the owner. Accordingly, we reverse the judgment as to the corporation, affirm the judgment as to the owner, and remand.

In determining whether an insurer has a duty to defend an action against its insured, the court looks at two things: the facts alleged in the complaint and the terms of the insurance policy. An insurer has a duty to defend an action against its insured if the claim stated in the underlying complaint could, without amendment, impose liability for conduct the policy covers. The insurer should be able to determine from the face of the complaint whether to accept or reject the tender of defense. It has a duty to defend if the complaint provides any basis of recovery for which the insurer provides coverage, resolving any ambiguity in the complaint in favor of the insured. *Ledford v. Gutoski*, 319 Or 397, 399-400, 877 P2d 80 (1994).

Given that standard, we state the facts as Winters alleged them in the underlying complaint. Plaintiff John Minnis (John) is the owner of plaintiff Little John's Pizza Co., LLC. Little John's employed Tuck Minnis (Tuck) to manage the restaurant. Winters alleged that she had been an employee of Little John's and that while she was employed, Tuck engaged in a variety of misconduct towards her. Throughout Winters' employment with Little John's, Tuck allegedly subjected her to a sexually hostile work environment that included, "[u]nwelcome statements and graphic descriptions of sex habits, activities, body parts and abilities" and repeated "offensive sexual comments about the anatomy of females * * *." According to Winters' complaint, "sexual

harassment was part of defendant Tuck Minnis' management style."

Most of Tuck's alleged misconduct occurred on the job. Some occurred at his apartment. Plaintiffs rely on the sexual harassment that occurred at the apartment to establish that defendant had a duty to defend them. Paragraph 8 of Winters' complaint alleges:

> "On or about May 28, 1995, plaintiff's supervisor, defendant Tuck Minnis[,] called her at home at 3:45 a.m. and implored her and her female roommate, the assistant manager of Little John's Pizza Co., L.L.C., to come over to his apartment to help him grieve the death of his brother. Plaintiff and her roommate went to his apartment and stayed from approximately 4:30 a.m. until 9:00 a.m. During that time period plaintiff was subjected to sexually explicit, unwelcome, offensive and intimidating comments and conduct from her supervisor, defendant Tuck Minnis."

In paragraph 9, Winters alleged specific "intimidating, unwanted, and demeaning sexual contact and remarks directed from defendant Tuck Minnis to plaintiff" while Winters was at Tuck's apartment, including that Tuck engaged in "[u]nwelcome forced kissing, and touching of plaintiff's breasts while pinning her arms against the wall[.]" She also alleged that while she was at the apartment, Tuck made "[i]ntimidating statements about his ability to fire employees at Little John's Pizza Co., L.L.C., but that [Winters] should think of herself as his friend."

Winters asserted six claims for relief variously against Little John's, Tuck, and John. We summarize the three claims that are relevant to our decision.[1] Her third claim, which she labeled as "Sexual Assault and Battery," was against Tuck and Little John's. In that claim, Winters alleged that Tuck "intended harmful, offensive, hostile, and

---

[1] Plaintiffs appear to rely on the allegations of paragraphs 8 and 9, in isolation from the rest of the complaint, in arguing that they are entitled to coverage. That focus is too limited, however. The issue is whether any specific *claim* in the underlying complaint would give rise to coverage. The basis for coverage is not necessarily limited to the legal theory with which the underlying plaintiff labeled the claim, *see Ferguson v. Birmingham Fire Ins.*, 254 Or 496, 507, 460 P2d 342 (1969), but there must be a claim that, without amendment, would permit proof of a liability that the policy covers, *see Ledford*, 319 Or at 402-03.

insulting physical contact of a sexual nature" to her, that he did so within the scope of his employment, that Little John's condoned Tuck's conduct, and that Tuck's conduct was not unexpected because of Little John's failure to have any policy or training relating to sexual harassment. As a result of Tuck's actions, Winters allegedly suffered "severe emotional distress, depression, embarrassment, apprehension, fright, anguish, loss of dignity, humiliation, and physical anxiety, pain and nausea[.]" She also alleged that both defendants acted willfully, wantonly, and maliciously, entitling her to punitive damages in order to punish them and deter similar conduct in the future.

Winters labeled her fourth claim, against Tuck and Little John's, "Intentional Infliction of Severe Emotional Distress." She alleged that Tuck acted

> "volitionally with knowledge that his acts would cause plaintiff severe emotional distress, and also with the intent to cause plaintiff severe emotional distress. Defendant Tuck Minnis intentionally and deliberately committed the alleged acts under circumstances in which it was likely that plaintiff would suffer such distress."

She also alleged that Tuck's actions reflected the "deliberate intent of defendant Little John's Pizza Co., L.L.C." Her alleged harm was of the same nature as that described in the third claim, and her allegation concerning punitive damages was the same.

Winters' fifth claim was directed at Little John's and John. That claim was also labeled "Intentional Infliction of Emotional Distress." Winters alleged that John acted with the same state of mind that she had alleged in the fourth claim that Tuck had had, and she alleged the same harm that she had alleged in the third and fourth claims. Winters alleged that John and Little John's "condoned defendant Tuck Minnis' conduct in subjecting plaintiff to sexual harassment, assault and battery" and "retaliated against her for resisting and reporting the harassment and other abuse in a successful effort to force plaintiff from her job."

In the policy that it issued to Little John's,[2] defendant agreed to pay those sums that Little John's became

---

[2] John was a covered insured as an officer of Little John's.

legally obligated to pay "as damages because of bodily injury * * * [or] personal injury" and to provide a defense for any action seeking damages for those injuries. The policy applies to bodily injury caused by an "occurrence" during the policy period and to personal injury caused by an "offense" arising out of the business. The policy defines bodily injury to mean "bodily injury, sickness or disease sustained by a person[.]" It defines "personal injury" to mean "injury, other than bodily injury" arising out of one of several listed offenses. One of those offenses is "[f]alse arrest, detention or imprisonment[.]" There are a number of exclusions to the coverage of bodily injuries; no exclusion to the coverage of personal injuries is relevant to this case.

In *Klamath Pacific Corp. v. Reliance Ins. Co.*, 151 Or App 405, 950 P2d 909 (1997), *on recons* 152 Or App 738, 955 P2d 340 (1998), we held that an allegation of "severe physical * * * distress" stated a claim for bodily injury. 151 Or App at 414. Defendant recognizes that, under this court's decisions, Winters' allegations that she suffered "physical * * * pain and nausea" as a result of Tuck's actions state potential claims for bodily injury under the policy. On the other hand, her allegations that she suffered "severe emotional distress, depression, embarrassment, apprehension, fright, anguish, [and] loss of dignity" state potential claims for personal rather than bodily injury. Winters' claims thus raise issues under both policy coverages.

We first consider whether defendant had a duty to defend Winters' claims against Little John's for bodily injury. Because Winters' complaint alleges a claim for bodily injury against Little John's, the issues on appeal reduce to primarily two questions. The first is whether Winters' claims are excluded from coverage because they arose out of and in the course of her employment. The second is whether because Tuck acted intentionally, the injuries Winters sustained were either not an occurrence under the policy or were subject to an exception for intentional acts.

Defendant argues initially that the policy exclusion for bodily injury to "[a]n employee of the insured arising out of and in the course of employment by the insured" justifies its refusal to defend Little John's. Defendant acknowledges

that the bodily injury Winters suffered could have arisen when Tuck sexually assaulted her at his apartment. And because Tuck called Winters at her home and "implored" her and her roommate "to come over to his apartment to help him grieve the death of his brother," it does not appear that the injuries Winters sustained at the apartment occurred in the course of *her* employment. This case, thus, differs from *McLeod v. Tecorp International, Ltd.*, 318 Or 208, 216-17, 865 P2d 1283 (1993), and *Klamath Pacific*, where all of the harassment that gave rise to the employees' injuries occurred on the job.[3]

Defendant argues, however, that Little John's cannot be vicariously liable for Tuck's conduct at the apartment unless Winters was acting in the course of her employment. Defendant observes that Winters sought to hold Little John's vicariously liable for Tuck's misconduct on the theory that Tuck performed "his management functions in accordance with a management style that incorporated sexual harassment." It follows, defendant reasons, that Little John's could be held vicariously liable for Tuck's conduct at his apartment only if Tuck were supervising Winters at that time. Defendant concludes that if Tuck were supervising Winters at the apartment, Winters was also necessarily acting in the course of her employment. Alternatively, defendant argues that "[i]f Winters were not acting as an employee at the time of Tuck Minnis's conduct in his apartment, then Minnis could not have been supervising her. In short, as pleaded by Winters, she could not recover against [Little John's] if she were not in the course of her employment."

Defendant's argument turns on two assumptions. Its argument assumes initially that Little John's could be held vicariously liable for Tuck's sexual harassment if, as Winters' complaint alleges, sexual harassment was part of Tuck's way

---

[3] The court explained in *McLeod* that "[p]laintiff's complaint contains no allegations concerning events that occurred other than in connection with her employment at Tecorp, during her employment at Tecorp, and while she was at work at Tecorp." 318 Or at 217. Similarly, in *Klamath Pacific*, we explained that the employer could not avoid the force of *McLeod*'s reasoning because "there was no mention of tortious conduct occurring other than on the job." 151 Or App at 415. We added that the complaints "lacked an allegation of so much as a single event that occurred off the job." *Id.*

of supervising Little John's employees. Defendant's argument also assumes that Little John's could be held vicariously liable for Tuck's conduct at the apartment only if Tuck was supervising Winters at that time. We agree with the first assumption. It is both supported by the complaint and consistent with this court's decision in *Mains v. II Morrow, Inc.*, 128 Or App 625, 631-33, 877 P2d 88 (1994). We disagree with the second assumption. Even if Tuck were not acting as Winters' supervisor when he invited her to his apartment,[4] it does not necessarily follow that Little John's may not be held vicariously liable for Tuck's conduct at the apartment. Rather, the Supreme Court's recent decisions make clear that Little John's may be vicariously liable for Tuck's intentional torts at the apartment if those torts were a direct outgrowth of earlier actions that he took on behalf of Little John's.

The seminal case, for the purposes of this issue, is *Chesterman v. Barmon*, 305 Or 439, 753 P2d 404 (1988). In *Chesterman*, an employee took a drug to allow him to perform work for his corporation and later, as a result of ingesting the drug, broke into the victim's house and sexually assaulted her. The court held that the break-in and the assault "were, as a matter of law, outside the scope of employment. They were outside the authorized limits of time and space, were not motivated by a purpose to serve the employer and were not of a kind which [the employee] was hired to perform." *Id.*

---

[4] Winters' complaint alleges that "Tuck Minnis was plaintiff's direct supervisor and acted at all material times in the scope of his employment." We agree with the dissent that the first part of the allegation—that Tuck was Winters' direct supervisor—is an assertion of historical fact. We also agree that the second part of the allegation—that Tuck acted at all material times in the scope of his employment—is a conclusion of law. *See Moore v. Willis*, 307 Or 254, 259, 767 P2d 62 (1988). As such, it adds nothing to Winters' claim. The fact that Tuck was Winters' direct supervisor does not suggest that he was supervising her at the apartment; rather, the allegations in Winters' complaint point in precisely the opposite direction.

Fairly read, Winters' complaint alleges that Tuck sexually harassed her at the restaurant in his capacity as her supervisor and that when he invited her over to his apartment to grieve his brother's death, he was not acting in his supervisorial capacity. In determining whether Winters' allegations are sufficient to establish coverage, we construe her complaint liberally. *See Farris v. U.S. Fidelity & Guaranty*, 273 Or 628, 636-37, 542 P2d 1031 (1975) (even though complaint alleged that an employee's acts were committed at the employers' direction, coverage was appropriate because the jury could still have held the employer vicariously liable); *cf. Bradbury v. Teachers Standards and Practices Comm.*, 328 Or 391, 396-97, 977 P2d 1153 (1999) (declining to limit the allegations in the plaintiff's complaint to a defamation claim).

at 443. The court also held, however, that the employer could still be held vicariously liable for its employee's intentional torts (the break-in and the assault) as long as the act (ingesting the drug) that allegedly resulted in those torts was within the scope of employment. *Id.*

The court recognized in *Chesterman* that previously it had "determined whether *respondeat superior* applied as of the time that the injury occurred." *Id.* at 444. It explained, however, that that is not the only basis for determining whether *respondeat superior* applies. The court reasoned that "in cases where there is a 'time-lag' between the act allegedly producing the harm and the resulting harm, it is inappropriate to determine whether *respondeat superior* applied as of the time when the injury occurred." *Fearing v. Bucher*, 328 Or 367, 373, 977 P2d 1163 (1999) (summarizing *Chesterman*'s reasoning). "Rather, '[t]he focus should be on the *act* on which vicarious liability is based and not on when the act results in *injury*.' " *Id.* (quoting *Chesterman*, 305 Or at 444; emphasis in *Chesterman*).

■ ■ *Chesterman* establishes two related but separate propositions. First, an employee's intentional tort need not occur within the time and space limits of the job to hold the employer vicariously liable. That much follows from the court's holding that even though the intentional torts in that case occurred "outside the authorized limits of time and space" of the employee's work, the employer could still be found vicariously liable for them. 305 Or at 443-44. Second, in order to hold an employer vicariously liable when there has been a "time lag" between the acts taken on the employer's behalf and the later intentional torts, the plaintiff must establish a causal connection between the two sets of acts. The question that remained after *Chesterman* was how strong that causal connection had to be.

The court recently reaffirmed *Chesterman*'s reasoning and addressed the sufficiency of the causal connection in *Fearing* and *Lourim v. Swensen*, 328 Or 380, 977 P2d 1157 (1999). In both those cases, the court recognized that an employee, as part of his or her job, may establish a relationship with another person that results in sexual abuse. The

court explained that it was not sufficient for vicarious liability that the employment merely "brought the tortfeasor and the victim together in time and place and, therefore, gave the tortfeasor the 'opportunity' to commit the assaults." *Fearing*, 328 Or at 377 (explaining *G.L. v. Kaiser Foundation Hospitals, Inc.*, 306 Or 54, 757 P2d 1347 (1988)). Rather, the allegations must permit the jury to infer that the acts taken within the scope of employment "were a necessary precursor to the sexual abuse and that the assaults were a direct outgrowth of and were engendered by conduct that was within the scope of [the employee's] employment." *Fearing*, 328 Or at 377.

The allegations in Winters' complaint would permit a jury to find that she met that standard. *See Fearing*, 328 Or at 376-77; *Blohm et al v. Glens Falls Ins. Co.*, 231 Or 410, 416, 373 P2d 412 (1962). A jury reasonably could find that the sexual harassment Tuck inflicted on Winters at the job site was within the scope of his employment—a point that defendant does not dispute. *See Mains*, 128 Or App at 631-33. The allegations would also permit a jury to infer that the sexual harassment at the job site was "a necessary precursor" to the sexual abuse that occurred at Tuck's apartment and that the assaults at the apartment were "a direct outgrowth of and were engendered by" the conduct that occurred on the job. *See Fearing*, 328 Or at 377. Defendant's own summary of the allegations in Winters' complaint establishes that much. According to defendant, the allegations in Winters' complaint would permit a jury to find that the "conduct that occurred at [Tuck's] apartment * * * was part of a protracted campaign of sexual harassment, sexual assault, and emotional intimidation that was predicated on and made possible by the employment relationship between Winters and Little John's."

The dissent concludes that Little John's cannot be held vicariously liable for Tuck's sexual harassment at the apartment because there was no causal connection between his actions at the restaurant and his actions at the apartment. The dissent's conclusion appears to turn on two related but separate propositions. The dissent begins by drawing the following proposition from the Supreme Court's cases: In order for there to be "a causal connection between the actions authorized by the employer and the acts that resulted in

harm to the [victim], * * * the harm [must have] occurred *while* the employee was engaged in an activity on behalf of the employer." (Emphasis added.) The court held, however, in *Chesterman* that even though the employee's intentional torts in that case occurred "outside the authorized limits of time and space" of his work, the employer could still be held vicariously liable if those torts were caused by earlier acts the employee took on the employer's behalf. 305 Or at 443-44. As we read *Chesterman, Fearing,* and *Lourim,* those cases establish that the question is whether there is a causal connection, not a temporal and spatial link, between the acts taken on the employer's behalf and the acts that result in harm.[5]

The dissent reasons alternatively that the allegations in Winters' complaint are factually insufficient to establish a causal connection between Tuck's acts at the restaurant and his acts at the apartment. As noted above, defendant recognized in its brief that, fairly summarized, Winters' complaint alleged that the "conduct that occurred at [Tuck's] apartment * * * was part of a protracted campaign of sexual harassment, sexual assault, and emotional intimidation that was predicated on and made possible by the employment relationship between Winters and Little John's." Defendant's admission is virtually identical to the causal standard the court announced in *Fearing* and *Lourim.*

Even if defendant's admission were not binding, it recognizes, as a reasonable juror could, that a two-month pattern of sexual intimidation and harassment begun at work can lead a supervisor to try to press his advantage off the job as well. A juror could reasonably conclude that the sexually charged relationship with Winters that Tuck pursued at

---

[5] We are not unaware of the dissent's concern that requiring a causal rather than a temporal and spatial link expands an employer's responsibility for its employees' intentional torts. If, however, our understanding of the Supreme Court's analysis in *Chesterman, Fearing,* and *Lourim* is correct, the concern is more appropriately addressed to that court rather than this one. We note that the Supreme Court placed limits on an employer's vicarious liability in *Fearing* by requiring a direct causal nexus between the acts taken on the employer's behalf and the intentional tort. The court thus explained in *Fearing* that the mere fact that the employment gave the employee the opportunity to commit an assault (a "but for" causal connection) is not sufficient to establish vicarious liability. Rather, a plaintiff's allegations must permit the jury to conclude that the acts taken on behalf of the employer were the "necessary precursor" of the later intentional torts and that the torts were a "direct outgrowth" of those acts. 328 Or at 376-77.

work caused him to try to lure her, by one stratagem or another, to his apartment and sexually assault her there. A juror, of course, could reach the opposite conclusion, but we cannot say, as a matter of law, that the allegations in Winters' complaint would not have permitted her to establish the requisite causal connection. *See Fearing*, 328 Or at 376-77 (a jury could reasonably infer necessary causal connection even though the plaintiff had not directly alleged that the priest's work-related activities caused the plaintiff's injuries).

That is particularly true where, as here, the issue arises in the context of deciding whether an insurer had a duty to defend its insured against a third-party's complaint. As the court explained in *Blohm*, any " 'doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action * * * will be resolved in the insured's favor.' " *Blohm*, 231 Or at 416, quoting 29A Am Jur 567, *Insurance*, § 1454; *see Cooper v. Commonwealth Land Title Ins. Co.*, 73 Or App 539, 543, 699 P2d 1128, *rev den* 299 Or 583 (1985). We follow that standard in concluding that the allegations in Winters' complaint would permit a reasonable juror to find Little John's vicariously liable for Tuck's conduct at the apartment.[6]

We turn to the second issue defendant raises to support its decision not to defend Little John's. That issue arises in several contexts: (1) whether the bodily injury was caused by an "occurrence," which the policy defines as "an accident, including continuous or repeated exposure to substantially the same harmful conditions;" (2) whether the policy exclusion for bodily injury "expected or intended from the standpoint of the insured" applies to avoid coverage; and (3) whether the state public policy against insurance coverage for intentional acts applies to prohibit coverage. We conclude that neither the limitation on injuries that are caused

---

[6] Although we share the dissent's concern that a court should not advance its own legal theory apart from that advanced by the litigants, we believe that it is appropriate, if not required, that we apply the Supreme Court's recent decisions in *Fearing* and *Lourim* to the question of vicarious liability that the parties raised and debated below. Those decisions were issued after the trial court entered its judgment, and they clarified the terms on which an employer may be held vicariously liable for its employee's sexual harassment of others.

by accident nor the exclusion for injuries that are caused intentionally negates defendant's duty to defend Little John's.

The policy does not define the term "accident," but we have recognized that the term usually means actions that are "unforeseen, unexpected, unintended or the like." *Safeco Ins. v. House*, 80 Or App 89, 96, 721 P2d 862, *rev den* 302 Or 86 (1986). When the term is defined in that way, the question whether a bodily injury was caused by an "accident" and the question whether it was caused intentionally present two sides of the same coin. *See Fox v. Country Mutual Ins. Co.*, 327 Or 500, 515 n 11, 964 P2d 997 (1998) (recognizing that the same requirement applies in policies covering losses caused by accident and those excluding coverage for intentional losses); *Albertson's Inc. v. Great Southwest Fire Ins. Co.*, 83 Or App 527, 530-31, 732 P2d 916, *rev den* 303 Or 332 (1987) (reasoning that cases interpreting the exclusion for intentional acts provide the appropriate measure for determining coverage of accidental injuries).[7] In each instance, the question is not whether the conduct that caused the injury was intentional but whether the insured specifically intended to cause the injury that gives rise to coverage. *See Ledford*, 319 Or at 402; *Neilsen v. St. Paul Companies*, 283 Or 277, 280-81, 583 P2d 545 (1978). More specifically, the question is whether the allegations establish that Little John's specifically intended to cause Winters bodily injury. A jury could find that it did not for two reasons.

■ ■ First, according to Winters' complaint, Tuck acted intentionally when he sexually harassed Winters. As explained above, however, Winters could have introduced evidence under the allegations in her complaint that would have permitted a jury to hold Little John's liable under the doctrine of *respondeat superior*, not for its own misconduct. *See Farris v. U.S. Fidelity & Guaranty*, 273 Or at 636-37; *Albertson's*, 83 Or App at 531-32. And the Supreme Court has recently reaffirmed that an employer may be liable for its

---

[7] An insurance policy, of course, could always define "accident" differently from the common understanding of that term. If it did, then the question whether the injury was caused by an accident might not be the obverse of the question whether it was caused intentionally.

employee's intentional torts under the doctrine of *respondeat superior* without any wrongdoing on the employer's part. *See Fearing,* 328 Or at 377; *see also McLeod v. Tecorp International, Ltd.,* 117 Or App 499, 502-03, 844 P2d 925 (1992), *mod on recons* 119 Or App 442, 850 P2d 1161, *rev'd on other grounds* 318 Or 208, 865 P2d 1283 (1993). It follows that under *Farris, Albertson's,* and *Fearing,* the jury could find that Tuck's conduct was accidental as to Little John's regardless of whether Tuck acted intentionally.[8]

Second, Winters' complaint alleged that Tuck intended to harass her sexually and cause her emotional distress, but it did not allege that he intended to cause her bodily injury. Specifically, Winters' third claim for relief alleged that Tuck intended "harmful, offensive, hostile, and insulting physical contact of a sexual nature." Her fourth claim for relief incorporated that allegation by reference. It also alleged that Tuck and Little John's acted with the intent of causing her severe emotional distress and that they "deliberately committed the alleged acts under circumstances in which it was likely that [Winters] would suffer such distress." In determining whether those allegations establish that Tuck intended to cause Winters bodily injury, we construe any ambiguities in the underlying complaint in favor of the insured. *Ledford,* 319 Or at 400.

Winters' allegations might require a jury to conclude that Tuck intended to cause her emotional distress. They do not, however, require a jury to conclude that he intended to cause her bodily injury, which is the relevant inquiry. Although the third and fourth claims for relief alleged that Tuck intended "harmful * * * physical contact of a sexual nature," the use of the word "harmful" is ambiguous. It could describe the nature of the contact rather than the notion that Tuck intended to inflict harm as such. Moreover, even if he intended to inflict harm, the allegation reasonably may be

---

[8] In *Farris,* the underlying complaint alleged that the employee's acts were committed with the employers' "knowledge, ratification or direction." 273 Or at 636. The court held that, despite those allegations, the underlying complaint would still permit the jury to impose liability on the employers on the basis of *respondeat superior* and to find that, as to the employers, the acts were not intentional. *Id.* That same rationale applies to the allegations in Winters' complaint against Little John's.

read as limited to emotional rather than bodily harm. It follows that the bodily injury Winters suffered was accidental as to Tuck and, *a fortiori*, as to Little John's. We conclude that defendant had a duty to defend Little John's against Winters' claims for bodily injury. Because defendant had a duty to defend Little John's on one claim, it had a duty to defend Little John's on all of Winters' claims.

 We reach a different conclusion with respect to defendant's duty to defend John. The allegations in Winters' fifth claim for relief are the only relevant allegations against John.[9] Winters' complaint does not allege that John was Tuck's employer,[10] and the allegations against John reduce to the proposition that Winters suffered bodily injury when John condoned Tuck's behavior, retaliated against Winters for reporting it, and effectively forced her to quit her job. All of the allegations in Winters' fifth claim for relief involve actions that were taken in John's capacity as owner of Little John's against Winters in the course and scope of her employment. Because those allegations fall squarely within the policy exclusion for bodily injuries arising out of and in the course of Winters' employment, defendant had no duty to defend John against Winters' claim.[11]

For the reasons stated above, we conclude that defendant had no duty to defend John. It did have a duty to defend Little John's; on remand, the trial court should enter partial summary judgment for Little John's on that issue. *See Cochran v. Connell*, 53 Or App 933, 939-40, 632 P2d 1385, *rev den* 292 Or 109 (1981). Defendant does not suggest that the

---

[9] Winters' second and fifth claims for relief are directed at John personally. Because the second claim for relief seeks lost wages and benefits, only the fifth claim for relief is relevant.

[10] The parties differ on this point. Defendant argues that the complaint permits the inference that John was Winters' employer, while plaintiffs argue that "[t]he underlying complaint does *not* allege that John Minnis was [Winters'] employer." (Emphasis in original.) We agree with plaintiffs that the allegations on which defendant relies are not sufficient to support the inference defendant draws from them.

[11] John is also not entitled to a defense under the personal injury coverage. The only potentially applicable basis for his claim under that coverage is that Tuck committed the policy "offense" of false imprisonment by pinning Winters' arms to the wall, thus intentionally confining her. Nothing in the complaint would support holding John personally liable for that conduct, in contrast to holding him liable for subsequently defending it.

record would support summary judgment in its favor on the duty to indemnify Little John's independently of its claim that it had no duty to defend Little John's. We accordingly leave that issue for the parties on remand.

Reversed and remanded as to plaintiff Little John's Pizza Co., LLC; otherwise affirmed.

**EDMONDS, P. J.,** dissenting.

The majority holds that the allegations against Little John's in Winters' complaint suffice to trigger defendant's duty to defend Little John's under its insurance policy. Those allegations are that Little John's manager, Tuck Minnis, acted within the scope of his employment when he sexually assaulted Little John's employee Winters at Tuck's apartment. For the reasons that follow, I disagree with the majority's analysis and with its conclusion that defendant's policy provides coverage to Little John's.

The majority is correct that defendant's duty to defend is governed by the allegations in Winters' complaint against Little John's and the terms of defendant's insurance policy insuring Little John's. In the policy, defendant agrees to "pay those sums that the Insured becomes legally obligated to pay as damages because of bodily injury * * * to which this insurance applies." The policy then excludes coverage for bodily injury to "[a]n employee of the insured arising out of and in the course of employment by the insured[.]" Defendant, relying on that exclusion, argues:

"The only conduct that [Little John's] contend[s] did not take place in the course of [Winters'] employment with [Little John's] is conduct that took place at Tuck Minnis's apartment 'after hours.' However, because the claim against [Little John's is] that [Tuck] was acting as [Little John's] supervisor at the time, [Winters] also had to have been in the course of her employment as an employee being 'supervised' by [Tuck]. Accordingly, the employee exclusion defeats coverage."

The majority responds to defendant's argument by reasoning,

"[d]efendant's argument turns on two assumptions. Its argument assumes initially that Little John's could be held

vicariously liable for Tuck's sexual harassment if, as Winters' complaint alleges, sexual harassment was part of Tuck's way of supervising Little John's employees. Defendant's argument also assumes that Little John's could be held vicariously liable for Tuck's conduct at the apartment only if Tuck was supervising Winters at that time. We agree with the first assumption. * * * We disagree with the second assumption. Even if Tuck were not acting as Winters' supervisor when he invited her to his apartment, it does not necessarily follow that Little John's may not be held vicariously liable for Tuck's conduct at the apartment. Rather, the Supreme Court's recent decisions make clear that Little John's may be vicariously liable for Tuck's intentional torts at the apartment if those torts were a direct outgrowth of earlier actions that he took on behalf of Little John's." 162 Or App at 204-05 (footnote omitted).

The majority proceeds to discuss the applicability of the holdings in *Chesterman v. Barmon*, 305 Or 439, 753 P2d 404 (1988), *Fearing v. Bucher*, 328 Or 367, 977 P2d 1163 (1999), and *Lourim v. Swensen*, 328 Or 380, 977 P2d 1157 (1999), to this case. It explains:

"[I]n order to hold an employer vicariously liable when there has been a 'time lag' between acts taken on the employer's behalf and the later intentional torts, the plaintiff must establish a causal connection between the two sets of acts. * * *.

"* * * In both [*Fearing* and *Lourim*], the court recognized that an employee, as part of his or her job, may establish a relationship with another person that results in sexual abuse. The court explained that it was not sufficient for vicarious liability that the employment merely 'brought the tortfeasor and the victim together in time and place and, therefore, gave the tortfeasor the "opportunity" to commit the assaults.' *Fearing*, 328 Or at 377 (explaining *G.L. v. Kaiser Foundation Hospitals, Inc.*, 306 Or 54, 757 P2d 1347 (1988)). Rather the allegations must permit the jury to infer that the acts taken within the scope of employment 'were a necessary precursor to the sexual abuse and that the assaults were a direct outgrowth of and were engendered by conduct that was within the scope of [the employee's] employment.' *Fearing*, 328 Or at 377.

"The allegations in Winters' complaint would permit a jury to find that she met that standard." 162 Or App at 206-07.

To unpack the majority's reasoning, it is important to begin with an understanding of how the case is postured on appeal. Little John's has appealed from a grant of summary judgment by the trial court after the court concluded that the policy did not provide coverage for the acts complained of by Winters. Little John's is in a dilemma. To obtain coverage under the policy, Little John's must demonstrate that it is vicariously liable for Tuck's conduct—conduct that is covered by the policy—but it must also demonstrate that Winters, its employee, was *not* acting within the scope of her employment when she was injured by Tuck. Otherwise, the exclusion for bodily injury to an employee (Winters) arising out of the course of employment would defeat coverage. Two hypothetical examples illustrates the dilemma. If Tuck had sexually assaulted Winters while they were delivering pizza together to a customer, then it could successfully be argued that the sexual assault resulted from Tuck's employment, giving rise to vicarious liability of Little John's. However, because Winters' injuries occurred within the course of her employment, the exclusion would preclude coverage for Little John's for any bodily injury claim that she could bring. Alternatively, if Tuck had been working on the roof of the pizza parlor, and Winters, after finishing her shift, was walking home on a public sidewalk underneath the roof when Tuck dropped a brick that hit her, then Little John's could successfully argue that the exclusion did not apply because Winters was not injured in the course of her employment. Thus, whether the exclusion applies depends on a careful scrutiny of the facts alleged by Winters in order to determine whether she and Tuck are deemed to have been in the course of their employment.

In paragraph 4 of the second amended complaint, Winters alleges that "[d]efendant Tuck Minnis was plaintiff's *direct supervisor* and *acted at all material times in the scope of his employment.*" (Emphasis added.) That language contains an allegation of fact (that Tuck was Winters' supervisor) and a conclusion (that at all times, Tuck was acting in the scope of his employment). From those allegations, Little

John's argues that it could be inferred from the allegation that Tuck was in the act of supervising Winters when the operative facts that resulted in the sexual assault occurred and that it is Tuck's act of supervision on which vicarious liability is allegedly imputed to Little John's.

Paragraphs 7, 8 and 9 of the complaint allege the facts about what occurred while Tuck was allegedly supervising Winters.

"7.

"During and throughout such employment as stated above, plaintiff's supervisor, defendant Tuck Minnis, a man approximately twenty years older than plaintiff, encouraged and engaged in a continuous pattern and practice of subjecting plaintiff to sexually explicit conduct and comments, creating a sexually hostile work environment, and conditioning plaintiff's continued employment on acquiescence to such an environment. Defendant Tuck Minnis'[s] sexually explicit comments included, but were not limited to the following:

"(a) Unwelcome statements and graphic descriptions of sex habits, activities, body parts and abilities;

"(b) Repeated offensive sexual comments about the anatomy of females;

"(c) Telling another employee under his supervision that he wanted plaintiff to 'wear short skirts with fishnet stockings.'

"8.

"On or about May 28, 1995, plaintiff's supervisor, defendant Tuck Minnis called her at home at 3:45 a.m. and implored her and her female roommate, the assistant manager of Little John's Pizza Co., L.L.C., to come over to his apartment to help him grieve the death of his brother. Plaintiff and her roommate went to his apartment and stayed from approximately 4:30 a.m. until 9:00 a.m. During that time period plaintiff was subjected to sexually explicit, unwelcome, offensive and intimidating comments and conduct from her supervisor, defendant Tuck Minnis.

"9.

"The intimidating, unwanted, and demeaning sexual contact and remarks directed from defendant Tuck Minnis to plaintiff on or about May 28, 1995, included but were not limited to the following:

"(a) Unwelcome forced kissing, and touching of plaintiff's breasts while pinning her arms against the wall;

"(b) Unwelcome lifting up of plaintiff's clothes and fondling plaintiff's body underneath;

"(c) Following plaintiff into the bathroom against her wishes and touching her against her will;

"(d) Intimidating and offensive graphic sexual comments ('I want to make you come') while forcing himself on top of plaintiff and asking her to have sex with him.

"(e) Unwelcome rubbing of defendant's body against plaintiff's body.

"(f) Intimidating statements about his ability to fire employees at Little John's Pizza Co., L.L.C., but that plaintiff should think of herself as his friend."

Based on the above allegations, Little John's argues that the employee exclusion in the policy does not apply because "the tortious conduct alleged in paragraphs 8 and 9 of the underlying complaint occurred off the job and not in the course of Winters' employment." That argument ignores the facts stated in paragraph 8. If Tuck was supervising Winters at his apartment as alleged, then it follows that Winters was being supervised by Tuck in the course of her employment, thereby triggering the policy exclusion. Moreover, the conclusions that Tuck was acting within the course of his employment and Winters was not within the course of her employment are belied by the facts actually alleged. According to the complaint, Winters was called to his apartment by Tuck to help grieve the death of his brother.

The majority rescues Little John's from that dilemma by embarking on a different course of reasoning. It ignores the fact that Winters alleges that Tuck was acting in the course of his employment when he "implored her * * * to come over to his apartment to help him grieve the death of his brother." Rather, the majority holds that, because Tuck sexually harassed Winters at work while he was supervising

her, it necessarily follows that Little John's is vicariously liable for his actions at his apartment under the holdings of *Fearing* and *Lourim*. In other words, the allegation in Winters' complaint that Tuck was at all times acting at Tuck's apartment as Winters' supervisor is immaterial to the majority's analysis.

There are at least three problems with the majority's reasoning. There is no causal connection between Tuck's harassment of Winters at Little John's and the assault *at his apartment* that could render Little John's responsible under the doctrine of *respondeat superior*. Second, the proper focus for an analysis under *Chesterman* is on the circumstances that resulted in Winters' presence in Tuck's apartment rather than the sexual harassment that occurred at Little John's. Third, the majority's rationale disregards the fact that Winters' complaint alleges "supervision" at Tuck's apartment as the gravamen of Little John's vicarious liability and that defendant's obligation to defend is circumscribed by Winters' theory of her case. The majority should not advance its own legal theory apart from that advanced by Winters' pleading and hold defendant responsible under its policy on a theory not pled.

The beginning point of the majority's reasoning is based on its reading of the holdings in *Chesterman, Fearing* and *Lourim*.[1] A discussion of the facts in each case is instructive as to the proper analysis. In *Chesterman*, defendant's employee met with potential customers during an evening meeting to formulate plans and to obtain information for a remodeling project on behalf of his employer. After finishing his inspection of the property, he took a hallucinogenic drug while still on the property to counter feelings of depression and to give him energy to prepare a bid for the project. While driving to the site where he intended to prepare the bid, he stopped, broke into the plaintiff's locked bedroom and sexually assaulted her. The issue was whether the defendant employer was vicariously liable for the assault. Preliminarily, the court said,

---

[1] The briefs and arguments in this case were submitted after *Chesterman* but before *Fearing* and *Lourim* were decided.

"[c]onsequently, if plaintiff had attempted to premise the [employer's] vicariously liability *solely* on [its employee's] Barmon's acts of entry and assault, the [employer] would not be vicariously liable. The [employer] still may be found vicariously liable, however, if *other* acts which were within [its employee's] scope of employment resulted in the acts which led to injury to plaintiff." 305 Or at 443 (emphasis in original).

In analyzing the issue, the court said that three requirements for vicarious liability must be met:

"(1) whether the act occurred substantially within the time and space limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; (3) whether the act is of a kind which the employee was hired to perform." 305 Or at 442.

The court then applied the above requirements to the facts. It relied on the fact that the defendant's employee took the drug while he was on the property of his employer's potential customers and to help him prepare the bid. The assault occurred while the employee was traveling from one work site to another and while he was still within the course of his employment. The court also pointed to the fact that the defendant's employee was motivated by a purpose to serve his employer when he ingested the drug. Finally, the court observed that a jury could find that, because the defendant's employee was also the president of the corporate employer, he had authority to take measures to enable himself to continue to work on the project on behalf of the employer—arguably benefiting the employer by ingesting the drug. The court concluded that a jury could find that the breaking into the house by the employee and his assault of the plaintiff were acts that resulted from the employee's ingestion of the drug on behalf of his employer's business.[2]

In *Fearing*, the allegations by the plaintiff were that he had been sexually abused as a youth by a priest under the supervision of the defendant Archdiocese. The issue was

---

[2] *Chesterman* came to the court for review of a summary judgment for the employer.

whether the Archdiocese was vicariously liable for the activities of the priest. The plaintiff alleged that the priest was authorized by the defendant to act as a youth pastor and that as the result of the development of a relationship as a spiritual advisor and mentor, the priest had used the relationship to sexually assault him. Further, as the court explained,

> "[t]he complaint describes [the priest's] performance of his priestly and pastoral duties in developing a trust relationship with plaintiff and his family, *together with* the eventual sexual assaults, as '[m]anipulations.' Plaintiff then alleges:
>
>> " '*The [m]anipulations * * * were committed within the time and space limits of [the priest's] employment as youth pastor and priest*, were committed out of a desire, at least initially and partially, to fulfill his employment duties as youth pastor and priest, and the [m]anipulations were generally actions of a kind and nature which [the priest] was required to perform as youth pastor and priest.' " 328 Or at 372 (emphasis added).

Thus, the sexual assaults allegedly occurred while the priest was performing his duties as a priest. Relying on its holding in *Chesterman*, the court held that its inquiry did not end after determining whether the alleged sexual assault was outside the scope of the priest's employment. "The Archdiocese still could be found vicariously liable, if acts that were within [the priest's] scope of employment 'resulted in the acts which led to injury to plaintiff.' " *Fearing*, 328 Or at 374 (quoting *Chesterman*, 305 Or at 443). The court then held that the *Chesterman* requirements were satisfied by the allegations that the abuse resulted from the priest's exercise of his duties. *Id.* at 375. In summary, the priest was alleged to have used his position as a pastor to build the relationship that had resulted in the abuse; the exercise of his duties occurred within the time and space limits of employment; he was motivated, at least partially, by a purpose to serve the employer and his conduct as a mentor and spiritual advisor was the kind of conduct that he had been hired to perform.

In *Lourim*, a similar situation existed. The plaintiff alleged that he had been sexually abused by his Boy Scout leader when the plaintiff was a minor. The defendants were

Boy Scout organizations who had authorized the leader to have contact with individuals like the plaintiff. As a result of his duties on behalf of the organizations, the leader was able to form a relationship with the plaintiff that permitted him to gain a position of trust and to act as a mentor to the plaintiff. As a result of that relationship, the leader was able to sexually abuse the plaintiff while he was performing his authorized duties for the defendant organizations. The court recognized that

> "[t]he complaint describes [the Boy Scout leader's] performance of his duties as troop leader in developing a trust relationship with plaintiff and his family, *together with* the eventual sexual assaults as '[m]anipulations.' *Plaintiff alleges* in the complaint *that the manipulations were committed in connection with [the Boy Scout leader's] performance of his duties as troop leader*:
>
>> " '*The* [m]*anipulations * * * were committed within the time and space limits of his responsibilities as troop leader*, were committed out of a desire, at least initially and partially, to fulfill his duties as troop leader, and were generally actions of a kind and nature which [the Boy Scout leader] was required to perform as troop leader.' " 328 Or at 385 (emphasis added).

The court held the allegations sufficient to meet the three requirements of *Chesterman* because the relationship occurred within the time and space limits authorized by the employment, the leader was motivated to engender the relationship, at least in part, by a purpose to serve the organizations and the relationship was of a kind that the leader was authorized to form. *Lourim*, 328 Or at 387.

In this case, the majority holds that Tuck's acts, as alleged, were a direct outgrowth and engendered by the management style that he employed on the job and that those facts suffice to bring Tuck within the course of his employment, even though he was not in the act of supervising Winters at the time he committed the assault. It points out that in *Chesterman* the court emphasized that, in cases where there is a time lag between the act producing the harm and the resulting harm, the proper focus to determine whether *respondent superior* applies is not on the act that causes the harm. Rather, it is on whether there is a casual

connection between the authorized act by the employer and the act that causes the harm. For instance, the authorized act in *Chesterman* that resulted in the injury was the ingestion of the hallucinogenic drug that was intended to provide energy to prepare the bid for the work-related project. In *Fearing*, the authorized acts by the employer with the plaintiff involved the priest's role as a mentor and spiritual advisor. In *Lourim*, the authorized act by the employer was the formation and perpetuation of a mentor-type relationship between the Boy Scout leader and the plaintiff. In each case, there was a casual connection between the actions authorized by the employer and the acts that resulted in harm to the plaintiffs. In other words, the harm occurred while the employee was engaged in an activity on behalf of the employer.

In this case, the majority endeavors to bring Tuck's actions within the same kind of characterization. Winters alleges that Tuck engaged in a "continuous pattern and practice of subjecting [her] to sexually explicit conduct and comments, creating a sexually hostile work environment, and conditioning [her] continued employment on acquiescence to such an environment." According to the majority, those allegations allege conduct for which Little John's is vicariously liable and, because there was a continuation of Tuck's offensive conduct outside the work environment when he assaulted Winters in his apartment, therefore there is a sufficient casual connection to hold Little John's vicariously liable for the assault. The majority correctly describes the holdings in *Chesterman, Fearing* and *Lourim* but misapplies them to the facts of this case, resulting in a flawed analysis.

According to the majority, "[a] jury could reasonably find that the sexual harassment that Tuck inflicted on Winters at the job site was within the scope of his employment[,] * * * [and] [t]he allegations would also permit a jury to infer that the sexual harassment at the job site was a 'necessary precursor' to the sexual abuse" that occurred at Tuck's apartment. 162 Or App at 207. In other words, the syllogism proffered by the majority is that the sexual abuse of Winters at Tuck's apartment was causally connected to Tuck's employment because Tuck previously sexually harassed Winters at work. What that proposition ignores is that Little John's vicarious liability for the sexual harassment of

Winters at work occurs legally because Tuck was acting in his role as Winters' supervisor at the time. It is Tuck's *supervisory* conduct at work that serves as the "precursor," the predicate authorized conduct that results in liability under the doctrine of *respondent superior*. That predicate is missing in the allegations that describe the precursor to Winters being in Tuck's apartment.

The necessity of Tuck being involved in a work-related precursor at the apartment to a legally cognizable casual connection between Tuck's actions at the apartment and Winter's employment becomes apparent when the facts as alleged in this case undergo the scrutiny of the *Chesterman* requirements, all of which must be met before vicarious liability exists. The first requirement is that Tuck's actions that resulted in the sexual assault must have occurred substantially within the time and space limits of employment authorized by the employer, even though a time lag exists between the authorized conduct and the act producing the harm. In *Chesterman*, although a time lag existed between the taking of the drug and the assault, the employee was in the midst of his employment-related duties when the assault occurred. The same factual predicate existed in *Fearing* and *Lourim*. In contrast, Tuck was not in the midst of his employment as the manager of Little John's pizza parlor when he was at his apartment grieving for his deceased brother at 4:30 a.m. Unlike the facts or allegations in *Chesterman, Fearing* and *Lourim*, there are no allegations in the complaint that meet the first requirement that Tuck's actions that resulted in the sexual assault must have occurred substantially within the time and space limits of the employment authorized by the employer.

The second requirement asks whether Tuck was motivated, at least partially, by a purpose to serve Little John's by the activity that prompted Winters' presence at Tuck's apartment.[3] Again, Winters' pleading clearly answers that question. Winters was "implored" to come to Tuck's

---

[3] In *G.L.*, the court recognized that "[t]he most common limitation on employer liability is that the intentional act must have been undertaken with the intent of furthering the business purposes of the employer, however misguided that intent might seem." 306 Or at 60.

apartment "to help him grieve the death of his brother." That activity is unrelated to any motivation to serve the interests of Little John's in the preparation and selling of pizza to the public. The final requirement is that Tuck's act that resulted in the assault at the apartment must have been the kind that Little John's hired him to perform. Once again, Winters' complaint fails that requirement. Helping a supervisor grieve a personal loss during off-work hours is not alleged to be the kind of act that Tuck or Winters were hired to perform by Little John's. *Compare Chesterman*, 305 Or at 443 (holding that the president of a company arguably has authority to take steps to continue a work project even if it means taking a drug to enable him to continue) *with Bray v. American Property Management Corp.*, 156 Or App 356, 365, 965 P2d 426 (1998), (holding that a parking attendant's use of excessive force in responding to an attack by a businessman was not reasonably foreseeable from the nature of his job to be the kind of act the attendant had been hired to perform).

In summary, the majority's effort to bring this case under the holding of *Chesterman* and to avoid Little John's dilemma must fail. Tuck's conduct at work and at his apartment are discrete events. The only connection that they have with each other is that they involve the same participants. The fact that Tuck sexually harassed Winters at work is not part of the chain of causation that resulted in his sexual assault of her at the apartment. Winters does not allege that she was prompted to go to Tuck's apartment because she had been sexually harassed at work or that the sexual assault would not have occurred but for the harassment at work. Winters alleges that she went to Tuck's apartment because he was her work supervisor. The only plausible connection between Winters' work environment and her presence at the apartment is that Tuck was her supervisor.[4] Consequently,

---

[4] The logical extension of the majority's reasoning is that an employer becomes vicariously liable for any tort committed by an employee against another employee during off-work hours if it can be shown that the tort is part of a continuing pattern of conduct that occurred during work hours. The majority's rule, in effect, makes the employer the insurer of a supervisor's off-work activities and extends the concept of vicarious liability beyond previously cognizable boundaries. *Cf. Mains v. II Morrow, Inc.*, 128 Or App 625, 631-32, 877 P2d 88 (1994) (reviewing the connection between the policy of risk allocation underlying vicarious liability and the requirement that the employee act within the scope of employment).

there is no allegation that gives rise to the inference that Tuck's sexual harassment of Winters at work was a "necessary precursor" in the chain of causation that led to Winters' victimization.

Little John's has recognized in its legal theory of its case what the majority has not: for it to be vicariously liable, Tuck must have been engaged in an activity at his apartment on Little John's behalf that led to the assault. That is why it alleges that Tuck was acting as Winters' supervisor "at all material times." That is also why Little John's cannot avoid its dilemma: if Tuck was acting within the scope of his managerial duties when he "implored" Winters to come over to his apartment at 3:45 a.m. and "help him grieve the death of his brother," then the exclusion for Winters acting in the course of her employment in the policy also applies. In light of Little John's theory of its case, the trial court did not err in granting summary judgment to defendant on the claims for bodily injury.

The trial court also ruled that defendant did not have a duty to defend under the "personal injury" coverage of the policy. The policy defines "personal injury" to mean injury, other than bodily injury, arising out of one or more of the following offenses:

"a. False arrest, detention or imprisonment;

"b. Malicious prosecution;

"c. The wrongful eviction from, wrongful entry into, or invasion of the right or private occupancy of a room, dwelling or premises that a person occupies, by or on behalf of its owner, landlord or lessor;

"d. Oral or written publication of material that slanders or libels a person or organization or disparage a person's or organization's goods, products or services; or

"e. Oral or written publication of material that violates a person's right of privacy."

Little John's argues that Winters alleges that she was "detained" or "imprisoned" within the meaning of subsection a. and that Tuck wrongfully entered into a room occupied by Winters under subsection c. It points to allegations

that Tuck assaulted Winters "while pinning her arms against the wall" and that he followed her "into the bathroom against her wishes." However, none of Winters' claims is identified in her complaint as a false imprisonment or wrongful entry claim.[5]

Nonetheless, the labels of a pleading are not determinative. "[An] insurer has a duty to defend if the complaint provides *any basis* for which the insurer provides coverage[,]" and the obligation of defendant to defend depends on whether any of the *facts* alleged in Winters' complaint can reasonably be interpreted to include conduct within the coverage of the policy. *Ledford v. Gutoski*, 319 Or 397, 400, 877 P2d 80 (1994) (emphasis in original). Even if Winters' complaint alleges some conduct outside the coverage for personal injury, defendant has a duty to defend if certain allegations of fact without amendment could impose liability for conduct covered by the policy. Here, Winters alleges that she was pinned against the wall while she was being sexually assaulted. A "false imprisonment" occurs when there is an unlawful restraint of one's freedom of movement. The restraint need not be for more than a brief time, so long as the person being confined is aware of the confinement. *See Lukas v. J. C. Penney Co.*, 233 Or 345, 353, 378 P2d 717 (1963). Winters' allegations can reasonably be interpreted to satisfy the elements of the tort of false imprisonment without amendment. It follows that the coverage in the policy for false imprisonment and defendant's duty to defend Little John's against claims of false imprisonment could be triggered, assuming that Winters has alleged ultimate facts from which it can be inferred that Tuck was acting in his capacity as Winters' supervisor at the time.

For the reasons previously discussed, none of the allegations in paragraphs 4, 7, 8, and 9 suffices to impute vicarious liability to Little John's for false imprisonment under *Chesterman*. The conclusory allegation in paragraph 4 that Tuck was acting "at all material times in the scope of

---

[5] According to her complaint, Winters alleges claims for "Sexual Harassment and Retaliation for Resisting Sexual Harassment-ORS 659.030," "Wrongful Discharge for Resisting Sexual Harassment," "Sexual Assault and Battery," two counts of "Intentional Infliction of Severe Emotional Distress," and aiding and abetting a violation of ORS 659.030.

his employment" is just that—a bald conclusion. The duty of defendant to defend under the policy depends on whether these are "ultimate facts" alleged that, if true, would establish that Tuck was acting within the course of employment when he assaulted Winters. The only pertinent ultimate facts alleged by Winters are that Tuck was her supervisor at work and that she was "implored * * * to come over to his apartment to help him grieve the death of his brother." To echo the court's opinion in *G.L.*, there is no allegation, and, I cannot imagine one, that the employee was acting for the purpose of furthering any interest of the employer when Tuck asked Winters to come to his apartment. 306 Or at 61.[6]

For the above reasons, the trial court did not err in granting summary judgment to defendant. I dissent.

---

[6] In *G.L.*, the plaintiff was sexually assaulted by a respiratory therapist employed at the defendant's hospital where she was recovering from surgery. 306 Or at 56. The therapist was not treating her when the assault occurred.