Argued and submitted March 1, 2001, decision of Court of Appeals affirmed in part and reversed in part; judgment of circuit court affirmed June 7, 2002

## John MINNIS
## and Little John's Pizza Co., LLC,
*Respondents on Review,*

*v.*

## OREGON MUTUAL INSURANCE COMPANY,
*Petitioner on Review.*

## (CC C96-1230-CV; CA A98241; SC S46892)

48 P3d 137

William G. Earle, Portland, argued the cause for petitioner on review. With him on the briefs were Alan Gladstone and Abbott, Davis, Rothwell, Mullin & Earls, P.C.

Christopher A. Rycewicz, Portland, argued the cause for respondents on review. With him on the briefs were Rycewicz & Chenoweth, LLP and Michael J. Knapp, of Myers & Knapp.

Kenneth Shiroishi, Portland, filed a brief on behalf of *amicus curiae* Oregon Association of Defense Counsel.

Before Carson, Chief Justice, and Gillette, Durham, Leeson, Riggs, and De Muniz, Justices.**

DE MUNIZ, J.

Riggs, J., specially concurred and filed an opinion.

** Kulongoski, J., resigned June 14, 2001, and did not participate in this decision. Balmer, J., did not participate in the consideration or decision of this case.

## DE MUNIZ, J.

In this insurance case, we are asked to determine whether Oregon Mutual Insurance Company (defendant) had a duty to defend its insured, Little John's Pizza (Little John's), in a tort action by a former Little John's employee, Winters. After that action was settled, Little John's and its owner, John Minnis (Minnis), brought this action against defendant. The trial court entered summary judgment in favor of defendant. The Court of Appeals reversed that judgment in part, holding that defendant had a duty to defend Little John's because Winters's complaint could have imposed vicarious liability on Little John's for conduct of its manager, Tuck Minnis (Tuck), that was covered under the policy.[1] *Minnis v. Oregon Mutual Ins. Co.*, 162 Or App 198, 212, 986 P2d 77 (1999).

We allowed defendant's petition for review and now conclude that, as explained below, the underlying complaint could not have imposed vicarious liability on Little John's for any conduct by its manager that was covered by the policy. Accordingly, defendant did not have a duty to defend Little John's. We affirm in part and reverse in part the decision of the Court of Appeals, and we affirm the judgment of the circuit court.

The material facts are not in dispute. John Minnis owned and operated Little John's, a pizza parlor that was managed by his brother, Tuck. Little John's hired Winters, then 17 years old, to work in the pizza parlor. After several months, Winters quit her job and brought an action against Minnis, Tuck, and Little John's, alleging that she was forced to quit her job because of sexual harassment.

In her complaint, Winters included claims of sexual harassment, wrongful discharge, sexual assault, and intentional infliction of severe emotional distress. Because the allegations in Winters's sexual harassment, sexual assault, and intentional infliction of severe emotional distress claims

---

[1] The Court of Appeals affirmed the judgment in favor of defendant in regard to plaintiff John Minnis. *Minnis v. Oregon Mutual Ins. Co.*, 162 Or App 198, 212, 986 P2d 77 (1999). Plaintiff Minnis did not petition for review of that decision.

are central to our discussion of whether defendant had a duty to defend Little John's, we set them out in detail here.[2]

Winters's first claim for relief was for sexual harassment. In that claim, Winters alleged that:

"At all material times, * * * Tuck Minnis was a management level employee of * * * Little John's * * *. * * * Tuck Minnis was [Winters's] direct supervisor and acted at all material times in the scope of his employment.

"At all material times, * * * John Minnis was the owner of * * * Little John's * * *. * * * John Minnis was [Winters's] direct supervisor and acted at all material times in the scope of his employment.

"[Winters] was employed by * * * Little John's * * * from approximately April 1, 1995[,] until July 5, 1995[,] when she was forced to quit her job.

"During and throughout such employment as stated above, [Winters's] supervisor, * * * Tuck Minnis, a man approximately twenty years older than [Winters], encouraged and engaged in a continuous pattern and practice of subjecting [Winters] to sexually explicit conduct and comments, creating a sexually hostile work environment, and conditioning [Winters's] continued employment on acquiescence to such an environment. * * * Tuck Minnis'[s] sexually explicit comments included, but were not limited to the following:

"(a)   Unwelcome statements and graphic descriptions of sex habits, activities, body parts[,] and abilities;

"(b)   Repeated offensive sexual comments about the anatomy of females;

"(c)   Telling another employee under his supervision that he wanted [Winters] to 'wear short skirts with fishnet stockings.'

"On or about May 28, 1995, * * * Tuck Minnis called [Winters] at home at 3:45 a.m. and implored her and her female roommate * * * to come over to his apartment to help him grieve the death of his brother. [Winters] and her roommate went to his apartment and stayed from approximately 4:30 a.m. until 9 a.m. During that time period

_____

[2] The wrongful discharge claim is not at issue in this case.

[Winters] was subjected to sexually explicit, unwelcome, offensive and intimidating comments and conduct from [Tuck Minnis, including]:

"(a) Unwelcome forced kissing, and touching of [Winters's] breasts while pinning her arms against the wall;

"(b) Unwelcome lifting up of [Winters's] clothes and fondling [Winters's] body underneath;

"(c) Following Winters into the bathroom against her wishes and touching her against her will;

"(d) Intimidating and offensive graphic sexual comments * * * while forcing himself on top of Winters and asking her to have sex with him;

"(e) Unwelcome rubbing of [Tuck Minnis's] body against [Winters's] body;

"(f) Intimidating statements about his ability to fire employees at Little John's * * *, but that [Winters] should think of herself as his friend.

"Upon returning to work after the above described incident, * * * Tuck Minnis continued to subject [Winters] to unwelcome sexual conduct, comments, and attempted flirtation, to continue the pattern and practice alleged [above], and to retaliate against [Winters] for having resisted his past sexual advances. * * * Little John's * * * had no anti-sexual harassment policy, and no specified avenue or avenues of complaint.

"On or about June 6, 1995[,] while [Winters] was working at * * * Little John's * * * with * * * Tuck Minnis, and while no other employees were there, [Winters] was again subjected to sexually explicit, intimidating, unwelcome and offensive comments and conduct directed towards her by her supervisor, * * * Tuck Minnis, which included but were not limited to the following:

"(a) Attempting to tear off [Winters's] clothing in an apparent effort to rape her. * * * Tuck Minnis pulled on [Winters's] pants so hard that they fell down around [her] ankles and * * * Tuck Minnis * * * fell off his chair;

"(b) Unwelcome and offensive graphic sexual comments * * *;

"(c)  Unwelcome rubbing of [Minnis's] body against [Winters's] body;

"(d)  Chasing [Winters] around the pizza parlor;

"(e)  Unwelcome touching of [Winters's] body and grabbing her face.

"* * * * *

"[Winters] reported the harassment described above to her mother and to other co-workers at the pizza parlor. [Winters's] mother and [Winters] reported the harassment to * * * John Minnis. * * *

"* * * * *

"[Tuck, Minnis, and Little John's] retaliated against [Winters] for resisting and reporting the sexual harassment conduct * * * by engaging in a course of intentional conduct designed to further traumatize [Winters] and force her to quit, including but not limited to excusing and condoning * * * Tuck Minnis'[s] conduct toward [Winters], retaining Tuck Minnis as an employee and continuing him as [Winters's] supervisor following the report of harassment despite the nature and severity of the harassment, assigning [Winters] to undesirable later night shifts, ordering her to change her wardrobe on and off work, setting rules for women employees that were not applied to men, reducing [Winters's] work hours, changing her job duties from hostess to cook, punitively treating her in a rude and angry manner, and writing her up for alleged insubordination on the job.

"* * * * *

"As a result * * *, [Winters] has suffered lost wages and benefits of employment * * *."

In her claim of sexual assault and battery (brought against Tuck and Little John's), Winters realleged and incorporated the foregoing factual allegations of her claim of sexual harassment. In addition, she alleged that "Tuck Minnis intended harmful, offensive, hostile, and insulting physical contact of a sexual nature to [her] person." She also alleged that, as a result of the sexual assault, she suffered

"severe emotional distress, depression, embarrassment, * * * physical anxiety, and pain and nausea."

Finally, in her two claims of intentional infliction of severe emotional distress (one brought against Tuck and Little John's, the other against Minnis and Little John's), Winters again realleged and incorporated the factual allegations of the sexual harassment claim, set out above. She also alleged that the intentional infliction of severe emotional distress resulted not only in severe emotional distress, but also "physical anxiety, pain and nausea."

During the time period addressed in Winters's complaint, Little John's was insured under a commercial general liability policy issued by defendant. Plaintiffs tendered defense of Winters's action to defendant. Before we describe the events that occurred after that tender, we first describe the relevant terms of the insurance coverage as set out in the insurance policy.

Under Little John's commercial general liability policy, defendant had a duty to defend employees of Little John's, acting in the course and scope of their employment, in any action seeking damages for "bodily injury" or "personal injury" as defined in the policy. The "bodily injury" coverage of the policy covered "bodily injury, sickness or disease sustained by a person * * *" and "caused by an occurrence" in the "coverage territory." That coverage specifically excluded "bodily injury to an employee of the insured arising out of and in the course of employment by the insured" (employee exclusion) and "bodily injury * * * expected or intended from the standpoint of the insured" (intended acts exclusion). The "personal injury" coverage of the policy covered "injury, other than bodily injury, arising out of" enumerated "offenses," including, to the extent relevant in this case, "false imprisonment." Although the personal injury coverage also had exclusions, none of those is relevant here.

Defendant refused to defend. After settling Winters's action, plaintiffs brought this action to recover the costs of settling and defending Winters's action. Plaintiffs and defendant moved for summary judgment. As noted above, the trial court entered summary judgment in favor of defendant, and plaintiffs appealed.

The Court of Appeals, in a split decision, affirmed the trial court's judgment in regard to plaintiff Minnis, but

reversed it in regard to plaintiff Little John's. It held that Winters's allegations concerning Tuck's actions at the apartment could have imposed liability on Little John's under the "bodily injury" coverage of the policy. That holding was based on several conclusions. First, the majority explained that, even if Tuck was not acting in the course of his employment when he assaulted Winters at his apartment, Little John's nevertheless could have been vicariously liable according to the doctrine of *respondeat superior* because those assaults were a " 'direct outgrowth of and engendered by' " Tuck's on-the-job harassment of Winters. *Minnis*, 162 Or App at 207, *citing Fearing v. Bucher*, 328 Or 367, 377, 977 P2d 1163 (1999). Second, the majority concluded that the employee exclusion of the bodily injury provision did not exclude from coverage the bodily injury ("pain and nausea")[3] Winters suffered as a result of Tuck's actions at his apartment, because Winters was not then acting in the course of her employment. *Id.* at 204. Finally, the majority also concluded that Tuck's assaults of plaintiff at his apartment were "occurrences" as defined in the policy and were not excluded under the intended acts exclusion.[4] *Id.* at 209-10.

Presiding Judge Edmonds dissented. He would have held that Little John's was not vicariously liable for Tuck's conduct at the apartment because Tuck's conduct at work was "not part of the chain of causation that resulted in" the sexual assault at the apartment. *Id.* at 224. He also would have held that, because Tuck's "supervision" of Winters was "the gravamen of Little John's vicarious liability" according to the theory of Winters's allegations, Winters's injury would have been excluded from coverage by the employee exclusion. *Id.* at 218, 225. As previously noted, we allowed defendant's petition for review.

■    We review the record on summary judgment in the light most favorable to the party opposing the motion. *Miller v. Water Wonderland Improvement District*, 326 Or 306, 309,

---

[3] Defendant does not dispute that Winters's allegation of having suffered "pain and nausea" constitutes a claim for "bodily" injury.

[4] The Court of Appeals also held that coverage of Tuck's actions was not precluded by the public policy against insurance for intentional acts. 162 Or App at 209-10.

951 P2d 720 (1998). In this case, such review presents several questions of law. The ultimate question is whether defendant has a duty to defend Little John's against Winters's claims. It has that duty only if the allegations in Winters's complaint state a claim for "bodily injury" or "personal injury" that is covered by the policy. *See Marleau v. Truck Insurance Exchange*, 333 Or 82, 91, 37 P3d 148 (2001) (insurer has duty to defend if factual allegations of complaint state claim for any offense covered by policy). Accordingly, we must examine the insurance policy to determine what the parties intended the policy to cover, *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469, 836 P2d 703 (1992), and the complaint to determine if it, "without amendment, may impose liability for conduct covered by the policy," *Ferguson v. Birmingham Fire Ins. Co.*, 254 Or 496, 507, 460 P2d 342 (1969). We begin by considering whether Winters's allegations may impose liability for conduct covered under the "bodily injury" provisions of the policy.

■      On review, Little John's adopts the reasoning of the majority of the Court of Appeals. First, in arguing that the policy covers Winters's bodily injury claim, Little John's relies only on the allegations of bodily injury that Winters suffered as a result of the episode at Tuck's apartment, because any injury Winters suffered at work, even if the result of otherwise covered conduct by Tuck, would have been excluded from coverage under the employee exclusion as an injury "arising out of and in the course of" Winters's employment. In addition, in regard to the injury Winters suffered as a result of the episode at the apartment, Little John's does not argue that Tuck was then acting in the course and scope of his employment. Instead, Little John's argues as follows: (1) The act that resulted in Winters's injury was Tuck's sexual harassment of Winters on-the-job (even if the particular episode of harassment did not take place there); and (2) Tuck was acting within the course and scope of employment when he harassed Winters at the pizza parlor.[5] Accordingly, Little

_____

[5] Little John's asserts that defendant conceded that Tuck was acting within the course and scope of his employment when he harassed Winters at the pizza parlor. Defendant disagrees. Because of our holding that Tuck's actions at work did not "result in" Winters's injury at the apartment, 162 Or App at 207, we need not determine whether those actions at work were taken within the course and scope of employment.

John's contends that, under this court's case law concerning the doctrine of *respondeat superior*, Winters's allegations are sufficient to impose vicarious liability on Little John's for Tuck's sexual abuse of Winters at his apartment. In addition, Little John's argues that the injury Winters suffered as a result of what happened at Tuck's apartment is not subject to the employee exclusion because Winters was not then at work. Finally, Little John's argues that Tuck's conduct was not "intended" by Little John's, and thus the injury resulting from that conduct is not subject to the intended acts exclusion.

Defendant adopts the reasoning of dissenting Judge Edmonds. It argues that Winters's allegations do not allow the inference that her injuries, as a result of Tuck's actions at his apartment, were caused by Tuck's actions at work or by any other act taken within the course and scope of employment. Therefore, Winters's allegations could not impose vicarious liability on Little John's. Defendant also argues that, because Winters alleges that her employment at Little John's is what "led to" the incident at the apartment and her resulting injury, even if Tuck's actions otherwise would be covered, coverage of Winters's injury is subject to the employee exclusion. Finally, defendant argues that, even if Tuck's actions otherwise could be covered by the policy, they nevertheless are excluded under the intended acts exclusion.

For the reasons set out below, we agree with defendant that, according to Winters's allegations, Winters's bodily injury was caused by Tuck's actions at his apartment, not by Tuck's actions at the workplace. Therefore, we reject Little John's theory of vicarious liability in this case.[6] Also as we explain below, Little John's argument and the conclusion of the Court of Appeals to the contrary are based on a misinterpretation of our case law on the doctrine of *respondeat superior*. Because of our holding concerning vicarious liability, we do not reach the question whether the bodily injury Winters suffered as a result of those actions would otherwise

---

[6] We note that, under the terms of the policy, Tuck also was an "insured" while he was acting "within the course and scope of his employment." The parties do not argue that that coverage is different from any coverage Little John's would have for its vicarious liability for Tuck's actions under the doctrine of *respondeat superior*.

be excluded from coverage under either the employee or the intended acts exclusion. We turn now to a discussion of the doctrine of *respondeat superior*.

■ ■ Under the doctrine of *respondeat superior*, an employer is liable for an employee's tort when the employee acts within the course and scope of employment. *Chesterman v. Barmon*, 305 Or 439, 442, 753 P2d 404 (1988). This court has stated that three requirements must be met to conclude that an employee was acting within the course and scope of employment: (1) the act must have "occurred substantially within the time and space limits authorized by the employment; (2) * * * the employee was motivated, at least partially, by a purpose to serve the employer; and (3) * * * the act is of a kind which the employee was hired to perform." *Id.*, citing *Stanfield v. Laccoarce*, 284 Or 651, 654, 588 P2d 1271 (1978).

In this case, before we apply the traditional *respondeat superior* test, we must identify the injury at issue and the act or acts that gave rise to it. Little John's does not argue that the injury Winters suffered while at work is covered by the policy, because any such injury presumably "arose out of and in the course of" Winters's employment and would be subject to the employee exclusion. Accordingly, the only injury that arguably is covered by the policy is the injury Winters suffered when she was not on duty, that is, the injury she suffered as a result of the episode at Tuck's apartment. As to the act or acts that gave rise to that injury, the parties disagree.

Defendant argues that the relevant act by Tuck that resulted in Winters's injury was his assaultive conduct at his apartment. Because Tuck was not acting within the course and scope of employment when he engaged in *that* assaultive conduct, defendant argues, Little John's cannot be vicariously liable for the resulting injury to Winters. In response to that argument, Little John's, as noted above, does not contend that Tuck was acting within the course and scope of his employment when he was at his own apartment. Little John's argues, instead, that it was Tuck's actions at the workplace—his "two-month pattern of sexual intimidation and harassment," as the Court of Appeals described it—that resulted in Winters's injury. 162 Or App at 208. Because *that*

conduct was undertaken within the course and scope of Tuck's employment, Little John's argues, it could be vicariously liable for the resulting injury to Winters. We agree with defendant, as explained below.

■■ In most instances, the relevant act for *respondeat superior* analysis is the act that was the immediate cause of the harm. *See Stroud v. Denny's Restaurant*, 271 Or 430, 437, 532 P2d 790 (1975) (*respondeat superior* analysis is made as of time injury occurred). However, this court has held that that rule is inappropriate in cases in which "there is a 'time-lag' between the act allegedly producing the harm and the resulting harm." *Chesterman*, 305 Or at 444. In those cases, "[t]he focus should be on the *act* on which vicarious liability is based and not on when the act results in *injury*." *Id*. So, for example, if an employee ingests a drug during the course and scope of employment that causes that employee to hallucinate and to commit a sexual assault on his way from one job site to another, the "act," for purposes of the first requirement of the *respondeat superior* test, is the act of ingesting the drug, not the assaultive conduct that was the immediate cause of injury to the victim of the sexual assault. *Id*. at 443. Vicarious liability may be imposed if acts that were within the course and scope of employment "*resulted in the acts which led to* [the] injury" at issue. *Id*. (emphasis added).

Implicitly recognizing that Tuck was not acting within the course and scope of his employment when he assaulted Winters at his apartment, Little John's argues that this court should use the "time-lag" standard described in *Chesterman*. However, reading Winters's complaint with that standard in mind reveals that her allegations do not describe the requisite *causal* connection between the workplace harassment and the sexual assault at the apartment.

Winters does not allege that the workplace harassment that preceded the episode at the apartment—the explicit sexual comments set out above—"resulted in" the sexual assault at the apartment. She alleges instead that the episode at the apartment was one of several episodes in a series. From those allegations, a reasonable juror could not have inferred that one example of Tuck's misconduct *resulted*

*in* or *caused* another. The sexual harassment at the workplace and the sexual abuse at the apartment were related to each other only as examples of Tuck's pattern, not as "cause" and "effect." Accordingly, the *Chesterman* "time-lag" standard does not apply to Winters's allegations.

In this case, the act that *resulted in* Winters's injury at Tuck's apartment was Tuck's abusive conduct *at* his apartment. Therefore, that is the conduct to which we apply the traditional *respondeat superior* test. In regard to the application of that test to Tuck's conduct at the apartment, Little John's does not argue that Tuck was then acting within the course and scope of his employment and, in our view, could not persuasively do so: Winters's allegations do not suggest that Tuck's assaultive conduct at the apartment "occurred substantially within the time and space limits authorized by the employment" as required under *Chesterman*, 305 Or at 442. Accordingly, Winters's allegations could not have imposed vicarious liability on Little John's for Tuck's actions at his apartment. Because any other bodily injury Winters suffered was excluded from coverage, we hold that defendant did not have a duty to defend Little John's under the "bodily injury" provision of the policy.

Before addressing the Court of Appeals' contrary conclusion, we offer the following point of clarification. According to the factual allegations of Winters's complaint, her claims against Little John's and John Minnis were based on their *direct liability* for sexual harassment, not on their *vicarious liability* for Tuck's actions at his apartment. Our conclusion, above, that Little John's was not *vicariously* liable for Tuck's actions at the apartment, has no bearing on whether Little John's could be *directly* liable for the alleged pattern and practice of sexual harassment of which Tuck's actions at his apartment formed a significant part. This case does not pose that question. Although that should be clear from our opinion, we emphasize it here because a case like this, which involves *both* an underlying action concerning the employer's direct liability *and* an insurance action that concerns the employer's vicarious liability, has the potential to cause confusion. That said, we turn to our discussion of the opinion of the Court of Appeals.

The Court of Appeals reasoned that the "causal connection" that Winters alleged between Tuck's workplace actions and Winters's injury from the assault at the apartment was as strong as the "causal connection" identified by this court as sufficient to support vicarious liability in *Fearing* and *Lourim v. Swensen*, 328 Or 380, 977 P2d 1157 (1999). *Minnis*, 162 Or App at 206-07. Indeed, the Court of Appeals used phrases from this court's opinion in *Fearing* to form the standard that it used in this case, holding, as set out above, that Little John's could have been vicariously liable because Tuck's assaults of Winters were the " 'direct outgrowth of and engendered by' " Tuck's on-the-job harassment. *Id.* at 207. However, as explained below, the Court of Appeals' reliance on *Fearing* and *Lourim* is misplaced.

Unlike *Chesterman*, *Fearing* and *Lourim* did not concern the first requirement of the *respondeat superior* test, namely, whether the employee's act was within the time and space limits authorized by the employment. *Fearing* and *Lourim* did not involve a "time-lag" between the act on which vicarious liability depended and the resulting harm. Instead, those cases focused more specifically on the other requirements of the *respondeat superior* test, whether the employee was motivated by a purpose to serve the employer and whether the act at issue was of a kind that the employee was hired to perform.

*Fearing* and *Lourim* presented this court with similar material facts. In each, the plaintiff had alleged that a person in a position of trust by virtue of his employment (in *Fearing*, a priest; in *Lourim*, a Boy Scout leader) used that position of trust to gain the opportunity to sexually assault the plaintiff. *Fearing*, 328 Or at 372; *Lourim*, 328 Or at 384-85. Each plaintiff characterized the tortious conduct as "manipulations committed within the time and space limits" of the tortfeasor's employment that were "generally actions of a kind and nature" that the tortfeasor was required to perform in his employment role (in *Fearing*, the tortfeasor's role as priest, in *Lourim*, the tortfeasor's role as Boy Scout leader). *Fearing*, 328 Or at 372; *Lourim*, 328 Or at 385.

This court explained in *Fearing* that, in the context of intentional torts, "it usually is inappropriate for the court

to base its decision * * * on whether the complaint contains allegations that the intentional tort *itself* was committed in furtherance of any interest of the employer or was of the same kind of activities that the employee was hired to perform." *Fearing*, 328 Or at 375-76. Employers do not ordinarily hire others for the specific purpose of committing intentional torts, and vicarious liability would be defeated in almost every instance under such a standard. Rather, for the purpose of determining whether a complaint meets the second and third *Chesterman* requirements (employer's purpose/kind of act hired to perform) for the imposition of vicarious liability, "the focus properly is directed at whether the complaint contains sufficient allegations of [employee's] conduct that was within the scope of his employment," that is, conduct that the employee was hired to perform, "that arguably *resulted in* the acts that caused [plaintiff's] injury." 328 Or at 376 (emphasis added). In both cases, this court held that the allegations in the complaint were sufficient to allow a jury to infer that the tortfeasor's "conduct in cultivating a trust relationship with the plaintiff was motivated, at least in part, by a desire to further the interests of the [employer], that that conduct was of a kind that the [employee] was hired to perform, and that that conduct led to the sexual assaults." *Lourim*, 328 Or at 386; *see also Fearing*, 328 Or at 376 (similarly stating). Accordingly, plaintiffs in those cases had stated claims for vicarious liability based on the doctrine of *respondeat superior*.

■ With the foregoing understanding of *Fearing* and *Lourim*, we return to the passage in *Fearing* on which the Court of Appeals relied for its standard in this case. In *Fearing*, this court stated that the allegations in that case stated a claim for the employing archdiocese's vicarious liability because:

> "[P]laintiff allege[d] that [priest] 'used and manipulated his fiduciary position, respect, and authority as youth pastor and priest' to befriend plaintiff and his family, gain their trust, spend large periods of time alone with plaintiff, physically touch plaintiff and, ultimately, to gain the opportunity to commit the sexual assaults upon him. A jury reasonably could infer that [the priest's] performance of his pastoral duties with respect to plaintiff and his family were

> *a necessary precursor to the sexual abuse and that the assaults thus were a direct outgrowth of and were engendered by conduct that was within the scope of [priest's] employment."*

328 Or at 377 (emphasis added). Understood in context, that passage addresses a situation in which the court must determine whether tortious conduct by a tortfeasor, acting within the time and space limits of employment, was sufficiently connected to the employer's purpose to support the employer's vicarious liability. If, however, the situation does *not* involve a tortfeasor who is acting within the time and space limits authorized by employment, the court does not reach the question of whether the tortious conduct was the "direct outgrowth of conduct that was within the scope of" the tortfeasor's employment.

.This case is an example of the latter situation: Tuck, while at his apartment, was not acting within the time and space limits authorized by his employment. Accordingly, the *Fearing* standard does not apply. We turn now to the personal injury coverage of the policy.

Little John's argues that Winters's claim concerning Tuck's actions at his apartment is a covered personal injury because it states a claim for false imprisonment, one of the offenses enumerated in the personal injury provision. However, a prerequisite for coverage under the personal injury provision, as under the bodily injury provision, is that the employee who caused the injury did so within the course and scope of employment. Therefore, even if Winters's allegations about Tuck's actions at his apartment state a claim of false imprisonment, the injury Winters suffered is not covered under the policy because, as discussed above, Tuck was not then acting within the course and scope of his employment.

Little John's does not argue that Winters's personal injury otherwise is covered by the policy, nor could Little John's do so persuasively. Winters's allegations concerning Tuck's actions at the pizza parlor—his offensive comments on repeated occasions or his conduct in chasing Winters and pulling at her clothes—do not allege claims for false imprisonment or detention or for any other covered "offense." *See Marleau*, 333 Or at 91 (insurer has duty to defend if factual

allegations of complaint state claim for any offense covered by policy). Accordingly, we hold that Winters's injury was not a covered "personal injury" as defined in the policy.

In sum, the bodily injury that Winters suffered while she was at work was excluded under the employee exclusion of the policy because it "arose out of and in the course of" Winters's employment. Only the bodily injury Winters suffered at Tuck's apartment arguably was not so excluded. However, we do not reach the question whether that injury, too, "arose out of and in the course of" *Winters's* employment, because coverage for any injury (whether "bodily" or "personal") as a result of Tuck's conduct at the apartment depends, first, on whether the injury she suffered was the result of conduct that Tuck undertook in the course and scope of *his* employment. Because we conclude that any injury Winters suffered as a result of Tuck's conduct at his apartment did not arise from any action Tuck took while acting in the course and scope of his employment, the episode at Tuck's apartment could not have imposed vicarious liability on Little John's under the doctrine of *respondeat superior*. Thus, Winters's injury as a result of that episode was not covered under the insurance policy.

As to the coverage under the "personal injury" provision of the insurance policy, there is no employee exclusion. However, the personal injury caused by Tuck's actions at the pizza parlor is not covered because it did not arise out of one of the covered "offenses" enumerated in the personal injury coverage provision of the insurance policy. Accordingly, Winter's injuries as a result of the episodes at the workplace also were not covered under the insurance policy. Therefore, because Winters's complaint did not state a claim for any offense covered by the insurance policy, defendant did not have a duty to defend Little John's.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed.

**RIGGS, J.,** specially concurring.

I agree with the majority that, according to the terms of the insurance policy and the allegations of Winters's

complaint, defendant did not have a duty to defend Little John's. Accordingly, I concur in the result. I write separately, however, because I disagree with the majority's reasoning.

I would hold that defendant did not have a duty to defend Little John's because the "intentional acts" exclusion of the insurance policy excluded Tuck's actions from coverage. Accordingly, I would not address the question whether Winters's bodily injury was caused by actions taken by Tuck during the course and scope of his employment.

Regarding the majority's conclusion that Winters's injury was not caused by any of Tuck's actions during the course and scope of his employment, I agree with the majority that this is not a "time-lag" case. Therefore, the Court of Appeals was incorrect to apply the reasoning of this court's decision in *Chesterman v. Barmon*, 305 Or 439, 753 P2d 404 (1988). Moreover, in holding that Winters's bodily injury was caused immediately by Tuck's actions *at the restaurant*, the Court of Appeals implies that Tuck's actions at his own apartment were not a cause of her injury, an implication I reject. Tuck acted of his own free will at his apartment, not under the influence of a hallucinogenic drug as the employee alleged in *Chesterman*. However, as explained below, I do not agree with the assumption by the Court of Appeals, the parties on review, and the majority of this court that Tuck could not have been acting within the course and scope of his employment when he assaulted Winters at his apartment.

In my view, in any case involving properly pleaded allegations of sexual harassment by a supervisor, there is a question of fact regarding whether that supervisor was acting within the course and scope of his employment, even if the assaultive conduct occurs in some location other than the workplace and during nonwork hours. That is so because, in any supervisor-employee relationship, there is the potential that the power of the relationship extends beyond that traditional venue of the workplace.

Furthermore, having a relationship that is sufficiently powerful to have influence after hours may serve the supervisor's employer too. In other words, the employer specifically may authorize the supervisor to work as the employee's mentor in all things pertaining to the job, and

that mentor-student relationship may be one that benefits the employer most if it extends past 5:00 p.m. In such circumstances, the supervisor who sexually assaults an employee, even if the assault occurs at a private residence, may be acting within the course and scope of his employment just as were the employees whose conduct was at issue in *Fearing v. Bucher*, 328 Or 367, 977 P2d 1163 (1999), and *Lourim v. Swensen*, 328 Or 380, 977 P2d 1157 (1999).

In this case, we need not reach the question whether, according to the allegations in Winters's complaint, this is such a case. However, I offer this concurring opinion to make clear that such a theory would be supported by our case law concerning the doctrine of *respondeat superior* in appropriate and properly pleaded circumstances.